694 So.2d 928 (1996)
SUCCESSION OF Alvin Peter JURISICH.
No. 94-CA-1262.
Court of Appeal of Louisiana, Fourth Circuit.
April 25, 1996.
Rehearing Denied May 31, 1996.
Writ Denied October 25, 1996.
*929 Dominic N. Varrecchio, New Orleans, for Appellants.
Steven O. Medo, Jr., Medo & Tete, New Orleans, and Charles Emile Bruneau, Jr., New Orleans, for Appellees.
Before KLEES and JONES and WALTZER, JJ.
JONES, Judge.
Appellants, Alan Jurisich, Donna Jurisich Brumat, Linda Jurisich Mollere, Peter Jurisich, Dr. Steven Jurisich, and Laurie Jurisich Henderson are the children of the decedent, Alvin Peter Jurisich. The Jurisich children appeal a judgment of the trial court sustaining the validity of a will executed by the decedent on September 12, 1990. In the challenged will, the decedent disinherited all *930 six of his adult children and left all his property to his second wife, Carol Velten Jurisich.

FACTS
Alvin Peter Jurisich died on August 24, 1991 leaving a statutory testament dated September 12, 1990. His widow, Carol Velten Jurisich filed a petition for probate of her deceased spouse's will and sought confirmation as testamentary executrix.
In the will, the testator declared that his first wife, Louise Villarubia, had predeceased him, that he had six living children who had been born to him during his first marriage, and that all of the children were at least twenty-three years of age. He left all his property to Carol Velten Jurisich, his second wife, and stated that in making the bequest of property to his second wife he was utilizing the provisions of Article 1493 of the Civil Code, as amended, effective July 1, 1990.[1]
He further declared that in the event Article 1493 was declared to be unconstitutional, or repealed, or amended to reinstitute forced heirship for competent major children, the following provision shall be applicable with respect to the disposition of his estate:
I disinherit my children, Alan Jurisich, Donna Jurisich Brumat, Linda Jurisich Mollere, Peter Jurisich, Steven Jurisich, and Laurie Jurisich Henderson. They have known how to contact me but have failed, without just cause, to communicate with me for a period of at least two (2) years prior to the date of this last will and testament. In fact, none of them, with the exception of Linda Jurisich Mollere, have contacted me since the estate of my late wife was settled in the late 1970s (sic). Each of them knows how to locate me at my home and my place of business. Each of them have failed and neglected to do so. Linda Jurisich Mollere inquired about my health during a recent hospitalization, however, there was no reconciliation between us. Each of them are majors, and the period of non-communication has far exceeded the two (2) years after obtaining the age of majority, as required by law. I urge the court to follow my wishes, as I am availing myself of the articles of the Civil Code relative to disinherison.
Finally, the testator further declared that in the event any of the disinherisons were disallowed, he left to such child a portion of his estate equal to the value of his or her legitime under Louisiana law as he intended to give no more than the required amount to satisfy such child's forced portion, if any, in effect at the time of his death.
The testator's six adult children filed a petition to annul the probated testament and to remove Carol Jurisich as executrix. The children alleged that the testament should be annulled and that the decree allowing probate of the will should be recalled for the following reasons:
1. the testament was defective based on lack of proper form.
2. The will was null "based upon the duress, undue influence and coercion upon decedent by the defendant, Carol Velten Jurisich," and based upon the fact "that the decedent was not of sound mind at the time of the drafting of the purported will."
3. The will was null because the "decedent bequeathed this property through sporadic hatred and anger at his children and through the manipulative and deceiving acts of defendant, Carol Velten Jurisich." The children averred that evidence of this factor was "now admissible due to the repeal of Article 1492 of the Louisiana Civil Code, as effective July 1, 1990."
4. Finally the children alleged the attempts to disinherit were invalid based on their "continuous and good-faith attempts to contact their father." The children alleged that they were prevented from contacting their father "by the manipulating and deceiving acts of defendant, Carol Velten Jurisich, who through her lies, deception and duress upon decedent" prevented them from spending time with their own father. Because of this factor, the children alleged that they "had the required `just *931 cause' as required in Article 1492, which prevented them from communicating with their father."
The children subsequently amended their petition to also assert the unconstitutionality of La.C.C. art. 1493.
Following the trial of the case, the trial judge, on August 20, 1993 issued a judgment finding that the last will and testament of Alvin Peter Jurisich dated September 12, 1990 was valid. In its reasons for judgment, the trial court rejected the Jurisich children's claim that Act 788 of 1989 was unconstitutional as violative of the Constitutional prohibition of Article XII, Section 5 of the Louisiana Constitution of 1974.
Act 788 of 1989 amended La.C.C. art. 1493 and changed the definition of a forced heir to only include a child under the age of twenty-three or a child who had been interdicted or a child who was subject to being interdicted because of mental incapacity or physical infirmity. The trial court opined that Act 788 of 1989, the provision which the decedent had initially availed himself of to deprive his children of their legitime, was constitutional as it did not abolish the concept of forced heirs, rather it merely redefined or made a determination of what class of persons would be forced. Actually, in the will dated September 12, 1990, the testator stated that he was utilizing Article 1493 of the Civil Code, as amended, effective July 1, 1990. It was in the will of July 16, 1990, that the testator stated that he was utilizing the provisions of Article 1493 of the Civil Code, "as amended by Act 788 of 1989, effective July 1, 1990." Both the 1989 and the 1990 amendments to La.C.C. art. 1493 redefined forced heir in a way that removed descendants twenty-three years of age or older (except for those with mental incapacities or physical infirmities) from the definition of forced heirs. Thus, the fact that the trial court, in its reasons for judgment referred to Act 788 of 1989 instead of La.C.C. art. 1493, as amended effective July 1, 1990 appears to be nothing more than a mere oversight, with no legal consequences.
The trial court further found that there was no undue influence or fraud per La.C.C. 1479 or La.C.C. 1478. The court rejected the children's argument that the testator was influenced by his second wife to the point of impairing the testator's will and further rejected the argument that the donation mortis causa was made under fraud or duress. The court duly noted that the testator had executed at least four last wills and testaments in his lifetime, that three of the wills were executed on November 22, 1988, July 16, 1990, and September 12, 1990, and that Mrs. Jurisich was not present at the signing of either 1990 testament. Considering these facts and considering the sworn testimony of all the parties, the court found no undue influence or fraud which would invalidate the testator's last will and testament. Accordingly the court concluded the will dated Sept 12, 1990 was valid.
Trial of the case was had on November 30, December 2, 3, 7, 8, 9, 10 and 11, 1992. More than thirty witnesses testified concerning the testator's relationship with his children, the testator's and the children's relationship with the testator's second wife, Carol Jurisich, and the testator's state of mind at the time he executed the various wills. The appellants attempted to prove that at the time that the various wills were executed, the testator was of unsound mind and that he was acting under the undue influence of his wife, Carol. The appellants also attempted to prove that the statement contained in the testator's will averring that they had failed to contact him for a period exceeding two years was false. Alternatively, the appellants attempted to present evidence to prove that if the statement concerning their failure to contact the testator was proven to be true, this failure to contact the testator occurred for reasons constituting just cause.
However, having found Act 788 to be constitutional, the trial court failed to address the issue of whether sufficient evidence had been adduced at trial to support disinherison because of a failure to communicate with the testator.

DISCUSSION AND LAW
Appellants initially argue that the trial court committed manifest error in failing to find that the legislative redefinitions of forced heirs found in La.C.C. article 1493, as *932 amended in 1989 and 1990, were unconstitutional.

Procedural history of La.C.C. article 1493
At the time the trial court issued its opinion, the Supreme Court was considering the issue of whether La.C.C. art. 1493 was constitutional. Within a month of the trial court's decision in the case sub judice, the Louisiana Supreme Court, in Succession of Lauga, 624 So.2d 1156 (La.1993), held that La.C.C. art. 1493 was unconstitutional.
Appellees' arguments criticizing the holding in Succession of Lauga, supra, while interesting, are not arguments that can be considered by this court. A discussion of the merits of appellees' arguments would be pointless inasmuch as this Court is bound to follow decisions of the Louisiana Supreme Court. See State Through Div. of Admin., State Land Office v. South Cent. Bell Telephone Co., 619 So.2d 749 (La.App. 4th Cir.), writ denied, 625 So.2d 1037 (La.1993); D'Antoni v. D'Antoni, 432 So.2d 926 (La.App. 4th Cir.1983); and Lombardo v. Argonaut Ins. Co., 354 So.2d 731 (La.App. 4th Cir.), writ denied, 355 So.2d 1325 (La.1978).
In reaching this decision, we also recognize that subsequent to the submission of this case, the Louisiana Legislature enacted Act No. 1180 of 1995. Pursuant to the provisions of Act No. 1180, the Legislature amended and reenacted, among other Civil Codal articles, Article 1493 to provide, in relevant part:
Art. 1493. Forced heirs; representation of forced heirs
A. Forced heirs are descendants of the first degree twenty-three years of age or younger, or descendants (sic) of any age who because of mental incapacity or physical infirmity, are incapable of taking care of their persons or administering their estates.
The wording of this newly enacted article is virtually identical to the language of Article 1493 at the time the decedent executed his will and at the time the Supreme Court, in Succession of Lauga, supra, held that Article 1493 was unconstitutional. Both laws redefined forced heir to exclude adult children, except for children twenty-three years of age or younger and/or those children with specific disabilities.
Act No. 1180 contained the following provision, which has been codified as La.R.S. 9:2501:
Section 5. This Act shall become effective on January 1, 1996, but only if the proposed amendment of Article XII, Section 5 of the Constitution of Louisiana contained in the Act which originated as House Bill No. 9 or Senate Bill No. 43 of this 1995 Regular Session of the Legislature is adopted at the gubernatorial primary election to be held in 1995 and becomes effective.
Pursuant to House Bill No. 9 which was passed as Act No. 1321, the following proposition was placed on the ballot for the gubernatorial primary election held in 1995:
To abolish forced heirship, except to require forced heirship for children twenty-three years of age or younger and to authorize the legislature to classify as forced heirs children of any age who are incapable of taking care of their person or estate due to mental incapacity or physical infirmity. (Amends Article XII, Section 5)
The majority of the electors of this State voted for this proposition, and on October 21, 1995, this amendment to Article XII, § 5 of the Louisiana Constitution was passed. As a result of that amendment, forced heirship, as it previously existed in the State of Louisiana was abolished.
The testament of the decedent, Alvin Jurisich was executed prior to January 1, 1996 and the decedent died in 1991. At the time that the decedent died, La.C.C. article 1493 had not yet been declared unconstitutional, nor had the Legislature proposed placing a constitutional provision allowing for the abolishing of forced heirship as it previously existed before the electorate.
However, considering the current state of the law, the initial question to be addressed by this Court is what effect, if any, does this new legislation have on the case sub judice.
La.C.C. art. 6 provides:
Art. 6. Retroactivity of laws
*933 In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary.
Further, one of the comments to Art. 6 provides:
(b) According to a well-settled rule of statutory interpretation, a substantive law applies prospectively only, unless it expressly or impliedly provides that it be applied both prospectively and retroactively. Of course, retroactive application of substantive laws is possible only to the extent that it is constitutionally permissible.
Pursuant to this Civil Code article, procedural and interpretive laws apply both prospectively and retrospectively, unless there is a legislative expression to the contrary. However, La.C.C. article 1493 is undoubtedly a substantive law. In the absence of contrary legislative expression, substantive laws apply prospectively only. Succession of Steckler, 95-227 (La.App. 5 Cir. 11/28/95); 665 So.2d 561.
The legislative intent concerning the application of the new law is found in La.R.S. 9:2501 which provides, in relevant part, as follows:
Sec. 2501. Successions of persons who die after December 31, 1995; construction of testaments executed prior to January 1, 1996
A. The provisions of Act No. [1180] of the 1995 Regular Session shall become effective on January 1, 1996, and shall apply to the successions of all persons who die after December 31, 1995.
B. If the person dies testate, and the testament is executed before January 1, 1996, then the testator's intent shall be ascertained according to the following rules:
(1) That the testament shall be governed by the law in effect at the time of the testator's death in any of the following instances:
(a) When the testament manifests an intent to disinherit a forced heir or to restrict a forced heir to the legitime in effect at the time of the testator's death.
This legislation specifically states what law is to govern in cases where the testament was executed prior to January 1, 1996. The wording of the statute indicates that application of the new statute is limited to the successions of persons who die after December 31, 1995.
This statute does not purport to address the situation where the testator died prior to the effective date of the statute. Since the new statute involves substantive law, it cannot be given retrospective or retroactive application. Consequently, the new statute cannot be applied in the case sub judice.
In reaching this conclusion, this Court is mindful of the ongoing debate concerning the revival of statutes by the subsequent recall of a decision by popular vote. However, having reviewed the newly enacted statute providing for changes in the forced heirship laws, we are convinced that any overruling of Succession of Lauga, supra, must be left to the Louisiana Supreme Court. In light of the holding in Succession of Lauga, supra, the trial court clearly erred in upholding the constitutionality of Article 1493 of the Civil Code. The judgment of the trial court upholding the constitutionality of Article 1493 of the Civil Code is reversed.
Having reversed the court's ruling on constitutionality, this Court must now decide whether to remand the case to the trial court for a factual determination of whether the alternative grounds for disinherisons were proven, or whether, given the fact that the record is complete, this court must now rule on the issues which were not specifically addressed in the trial court's opinion. This court is of the opinion that the better view would be to allow the trial court to rule on these issues in the first instance inasmuch as questions of credibility exist. However, the mandate given by the court in Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975) appears to dictate that this court decide these issues for the first time on appeal. Moreover, generally speaking when an appellate court finds that reversible error of law was made in the trial court, it is required to *934 review the entire record de novo and render judgment on the merits. Lasha v. Olin Corp., 625 So.2d 1002 (La.1993); Chatelain v. Circle K Corp., 94-0227 (La.App. 4 Cir. 10/13/94); 644 So.2d 1079; Musso v. Louisiana Dept. of Public Safety, 93-1243 (La.App. 4 Cir. 2/11/94); 632 So.2d 826. Consequently, this Court has reviewed the entire record of this case and undertaken a thorough review of all the relevant testimony and exhibits related to the disinherison of each of the testator's six adult children.

Disinherison for failure to communicate with the testator
In his last will and testament, the testator declared that he was disinheriting each of his six adult children for failing, without just cause, to communicate with him for a period of at least two years.
This cause for disinheriting a child is found in La.C.C. art. 1621 which provides, in relevant part:
The just causes for which parents may disinherit their children are twelve in number. There shall be a rebuttable presumption as to the facts set out in the act of disinherison to support these causes. These causes are, to wit:
* * * * * *
12. If the child has known how to contact the parent, but has failed without just cause to communicate with the parent for a period of two years after attaining the age of majority, except when the child is on active duty in any of the military forces of the United States.
Appellants argue that the trial court committed manifest error in failing to invalidate the disinherison of each of the six children based upon the above cited cause because the evidence presented at trial did not support a finding that the children failed to communicate with the testator for this period of time. Alternatively, appellants argue that the trial court committed manifest error in failing to invalidate the individual disinherisons of each of the testator's six children because each child respectively had "just cause" not to contact the decedent.
Citing Johns v. American Isuzu Motors, Inc., 622 So.2d 1208, 1211 (La.App. 2 Cir. 1993), the appellee argues that the fact that the judgment of the trial court is silent as to the issue of disinherison confirms the fact that the court rejected the appellants' arguments that cause for the disinherison did not exist. We disagree with this contention. The record contains no findings of fact on these issues. Having determined that the provisions of Act 788 of 1989 were unconstitutional and that the will was not executed as a result of any undue influence or fraud, the trial court clearly pretermitted any findings or discussion of whether the evidence presented at trial supported a finding that the testator had validly disinherited his children for failing to contact him for a period of at least two years.
The grounds for disinherison listed in La. C.C. art. 1621 create rebuttable presumptions as to the facts set forth in the act of disinherison to support the testator's cause for disinherison. Further, pursuant to the provisions of La.C.C. art. 1624 the forced heir bears the burden of proving that the cause stipulated for disinherison did not exist or that he was reconciled with the testator after the alleged act or circumstance which constitutes cause for disinherison. See Succession of Vidrine, 562 So.2d 52 (La. App. 3d Cir.1990) and Ambrose Succession v. Ambrose, 548 So.2d 37, 39 (La.App. 2d Cir. 1989). Any proof of reconciliation must be clear, unequivocal, evidenced in writing and signed by the testator. La.C.C. art. 1624. In the case sub judice, no written evidence of reconciliation was produced, thus the only issues to be determined are whether a two year period of non-communication was established and if so, did the forced heir prove that just cause existed for the failure to communicate.
The testator alleged that the children had failed to communicate with him since the settlement of their mother's estate in the late 1970's. However, the provision allowing for disinherison of children for failure to communicate with the parent for a period of two years after attaining the age of majority was enacted pursuant to Act 456 § 1 of 1985. The effective date of the statute, as amended *935 was September 6, 1985. Pursuant to this provision, failure to communicate with the parent for a period of two years constitutes a valid basis for disinheriting an adult child. Absent a finding that just cause existed for the failure to communicate, the disinherison provisions of the testator's will must be upheld. In Succession of Steckler, supra, our brethren on the Fifth Circuit rejected a claim that failure to communicate during a two year period prior to the effective date of the act could justify disinherison of a forced heir. The court gave the following reasons for rejecting such a claim:
... It [Act 456 of 1985] cannot be applied retroactively to this case because it would effectively divest plaintiff of his right of inheritance to not less than a fixed portion of his parent's estate based on action, or inaction, by plaintiff that was not prescribed at the time the acts took place. In other words, until the effective date of La.C.C. art. 1621(12), there was no legal duty placed upon plaintiff to communicate with his mother within every two year period or create a ground for his disinherison. Therefore, in determining whether to uphold the disinherison of plaintiff in his mother's will based on La.C.C. arg. 1621(12), we can only consider plaintiff's conduct after the effective date of the statute, that is, after September 6, 1985. Succession of Steckler, 665 So.2d at 564.
We respectfully disagree with this analysis. Clearly, no child has a vested right to receive a forced portion prior to the death of the parent. Consequently, this statute did not "divest" a descendant of any vested rights. Moreover, irrespective of whether the law imposed a "legal duty" upon a child to communicate with his parents at least every two years, it is the opinion of this court that in the absence of just cause, failure to communicate for such a long period of time would most likely constitute cruel treatment as specified in La.C.C. art. 1621(2). For this reason, paragraph (12) to La.C.C. art. 1621 would be considered as an interpretive law, capable of prospective and retrospective application. Thus, in our opinion, even though the Legislature did not specify that this legislation was interpretive, the testator's right to disinherit his children for failure to communicate with him vested fully effective September 6, 1985.
The appellants argue that the major events causing their ultimate alienation from the testator were his marriage to his second wife, Carol, his insistence upon selling certain property in Lacombe, and his constant rejection when they tried to contact him. However, our review of the record does not support a finding that these incidents were the primary causes of the alienation that existed between the decedent and his six adult children.
The testator's marriage to the children's mother ended when she died in 1971. At the time of their mother's death, only two of the children (Steven and Laurie) were still living at home. The marriage to Carol did not take place until March, 1977. At that time, five of the decedent's children had reached the age of majority. The sixth child, Laurie reached the age of majority on the day after the decedent's marriage to Carol. The disagreement concerning the Lacombe property was resolved in February, 1979 and the decedent died in August, 1991. The events surrounding the children's alienation from their father span at least a fourteen year time period.
In analyzing the relationship between the children and the decedent during this time period, this court has consciously refrained from relying upon uncorroborated testimony of Carol for the simple fact that the children steadfastly insisted that she told their father lies about them. By the same token, this court has also refrained from relying upon uncorroborated testimony of the children inasmuch as Carol insisted that the testator always stated that the children lied. The trial court made no findings of fact as to which witnesses were credible. For this reason, this Court will rely primarily upon the testimony of the six adult children and other witnesses who testified concerning the alienation of the testator from his children. However, this Court finds that the evidence supports the trial court's finding that the children failed to prove that the testator's will was made under the fraud or duress of the second wife, Carol Jurisich. As the trial *936 court duly noted, Carol Jurisich was not present when the testator executed the will of September 12, 1990.

The Lacombe incident
In his last will and testament, the testator declared that the children had not communicated with him since the settlement of their mother's estate in the late 1970's. The children however, maintained that the testator became hostile and rejecting of them over the settling of their mother's estate and thereafter rejected them so many times that they concluded that continued efforts to communicate with him would be futile.
The facts surrounding the sale of property located in Lacombe, Louisiana were hotly disputed. The children testified that the testator insisted upon selling the property, even though they begged him not to sell the property. The property had formerly been owned by their mother's family, but had been subsequently purchased by their father and mother. Upon their mother's death, the children became owners of the property, indivision with their father. Several of the siblings testified that they spent many happy hours at the house in Lacombe during their childhood and the property held great sentimental value for them. Alan and four of his siblings testified that they did not wish to see the Lacombe property sold.[2] However, the testator insisted upon selling the property.
The children believed the testator wanted to sell the property because of Carol's dislike for Lacombe. Several of the children testified that Carol always talked about buying a house in Mississippi, a nearby state which had no forced heirship laws. Carol, on the other hand testified that she loved the house in Lacombe. Carol denied having influenced the testator to sell the property and testified that the testator told her that he had to sell the property because the children wanted their mother's share of the community property and that the children wanted him to pay rent on the family home which was located on Louis XIV Street in New Orleans. This was the house in which the testator and Carol resided after their marriage. This house had been purchased during the marriage to their mother, thus was also property owned by the testator indivision with his children. Carol, Edmond Jurisich, the decedent's brother, and Charles Emile Bruneau, Jr., the attorney who drafted the decedent's will, testified that the testator was appalled at the fact that his own children wanted him to pay rent, when he was the person who had worked and paid for the house.
Carol testified that the testator initially drew up a document providing for an even swap of the children's interest in the family home in return for their father's interest in the property located in Lacombe. However, the testator told her Peter would not sign the document, and that the Lacombe property would have to be sold. Peter and several of the other children testified that this never occurred. Rather, according to several of the children, the testator informed his children that he planned to sell the Lacombe property.
Court documents introduced into evidence indicate that the father apparently filed the first legal papers seeking to partition the Lacombe property. In response, Donna, Linda, and Laurie filed exceptions alleging that additional property was owned in indivision, namely the family home, and that all the property had to be partitioned. No judgment is contained in the proceedings. Patrick J. Browne, one of the attorneys representing the Jurisich children in the partition proceedings testified that to the best of his recollection, a compromise agreement was reached. In fact, an agreement to purchase dated January 29, 1979 was introduced at trial. This document appears to have been signed by the testator, Alvin Jurisich and each of the six adult children on or about February 10, 1979. Pursuant to that agreement, the children agreed to sell the testator their 50% interest in the family home and their 56.25% interest in the property located in Lacombe for the sum of eighty-one thousand eight hundred thirteen dollars ($81,813.00). The agreement was predicated upon the testator's ability to borrow, with the property as security, the sum of $34,000 by a mortgage loan or loans at a fixed rate not to exceed 10% per annum over a thirty year *937 period. The final outcome of the litigation between the parties was that each child received a check for $13,000.00 in full settlement of his or her shares in the two properties. The Lacombe property was then sold to third parties. One of the children testified that the children were not in a position to buy the Lacombe property because only two of them were working at the time.
The children testified that after the sale of the property, the testator remained bitter, cold, and rejecting of his children. The record clearly supports a finding that the testator harbored ill feelings toward his children. He told numerous people, including his wife, Carol and his brother, Edmond that he wanted nothing to do with his children because they demanded rent from him, and forced him to give them their share of their mother's estate.
However, the record also indicates that the testator's relationship with several of his children was strained even before the selling of the Lacombe property. The starting point for this court's task of unraveling the relationship between the testator and his children will be the testimony of each of the six adult children.

ALAN JURISICH
Alan Jurisich was the eldest of the six children. At the time of the trial of this case in 1992, he was forty-six years old and employed as an environmental and industrial hygiene consultant. Alan testified that he moved out of the house in 1969, graduated from LSU, got married, got a job, served in the Army, went to graduate school, and eventually became employed.
He felt that there was a profound change in the relationship which the testator formerly enjoyed with his children after the testator married Carol, his second wife, in March of 1977. Alan testified that "Where there was once a good relationship, and some caring, and getting along, and trying to be a family, there was none. Suddenly, there was a lot of animosity." He felt less welcomed.
One major occurrence which he felt demonstrated the change in the relationship was that subsequent to the marriage to Carol, the testator "threw" his youngest sister, Laurie, out of the house. He had to take Laurie in and had to pay for an emergency tonsillectomy for her. Alan testified that he did not remember the exact details of what happened, just that she was thrown out. Most of his understanding of what had happened came from Laurie. Relationships were further exacerbated by the sale of the property in Lacombe.
Alan's testimony demonstrated that his relationship with his father became strained within three months of his father's remarriage. Notwithstanding an obvious lack of first hand information, Alan testified that Carol told lies about his sister Laurie and Laurie's boyfriend, Henry, and about his sister's sexual activity in the house when his father was not present. Additionally, he testified that Carol also told lies about his sister Donna rummaging through the house. Alan admitted that he was not a party to any of these activities, as he was removed from the day-to-day events that were going on. He received all his information about these incidents from his sisters and brothers.[3]
Alan did not get involved as he believed that if he stayed out of it, things would work themselves out. He remembers his dad was in Lacombe one day with Carol for the weekend. He and his wife decided to drive over and see them and dropped in to say hello. His dad was outside working in the garden. Alan got the distinct impression that, unlike before, he and his wife were very unwelcome, so they left. He did not feel welcome as there was a subtle coldness. His dad did not ask him to give him a hand or to spend the day. He figured his father had a new wife and there would be problems, but he thought that it was probably a transient thing.
Alan could point to no specific circumstances or communications from his father to explain why he felt unwelcome. However, he testified that he knew that the relationship with the other siblings was literally going to pieces. Examples of the changes in the *938 family relationships were 1) his dad had fired his brother, Peter, from his job at the Morning Call, the family owned business,[4] and 2) his dad was forcing a partition of his mother's estate.
Alan did not want his father to sell the Lacombe property and had a respectful conversation with him about it. He told his dad the siblings did not want to sell Lacombe. His dad informed him that he was putting it up for auction and he would have to bid on it. Alan did not enlist an attorney to help him with the litigation involving the sale of Lacombe. After the partitioning of the estate, there was, literally, no talking to his dad. According to Alan, the end result of all the litigation was that the relationship which he previously had enjoyed with his dad no longer existed. Alan felt that eventually all of this was going to work its way out, as time tends to heal a lot of wounds.
Alan admitted that after the settlement of his mother's estate, he made no attempts to contact his father and his father made no attempts to contact him. He gave the following reasons for not having attempted to contact his father after the settlement of his mother's estate:
"... I had the advantage of kind of looking over all this and seeing what was going on, and it was my assessment of the situation that any further attempts to contact him with this kind of a situation was going to be futile, first of all, and second of all, counterproductive. I really thought up until the very end, that if I just waited long enough, there was going to be an opportunity to renew relationships and put bad water under the bridge, or whatever you want to say."
He considered contacting his dad many times, particularly when he adopted his son but he knew that his brother, Steven, had attempted to do the same thing and it had not worked out. He also had ongoing monthly conversations with his barber, who was a friend of the family. His barber saw his father frequently and communicated to Alan on a number of different occasions that his father didn't want to see his children and didn't want to have anything to do with them.
Alan admitted that the last time he physically saw his father was when he went to Lacombe to visit him prior to the selling of Lacombe. He didn't write any letters. They talked over the phone about the sale of Lacombe, and that was about it.
Alan testified that his father was not the type of person to make misrepresentations in official documents. His father was a person with a temper but he would mellow over time and that is what he thought would happen. Alan found out his father had died from his wife when he returned from a fishing trip. He did not hear about his father's illness from any of his siblings until he returned from his trip. He was not "invited" to his father's funeral and did not go. He was upset and very angry with the situation and did not want to be in an environment where he could lose his temper and say some things that were out of place at a funeral. He realized that his father had died an angry man.
Alan Jurisich's testimony clearly establishes that he failed to communicate with his father after the sale of the Lacombe property. Thus, the only issue in dispute as to Alan Jurisich is whether he had "just cause" for having failed to communicate with his father from approximately 1979 when his mother's estate was settled up until August 24, 1991, the date of his father's death.
Given the overwhelming testimony that prior to his father's marriage, the relationship with all the children was good, it is difficult to find that a child who has been raised and educated by a "caring" father is excused from communicating with his father because of what he perceives as a "coldness" and because of reported incidents that occurred with his siblings. Alan's belief that attempts at communication with his father would have been useless is only speculative at best. Regardless of what he may honestly believe happened with the other siblings, he had no way of knowing how his father may have reacted to him, had he made the attempt to stay in touch. Significantly, all of *939 Alan's knowledge of what occurred came from his siblings. He does not even once suggest that he personally attempted to sit down and discuss matters with his father. Rather, he relied upon what his siblings told him to make the monumental decision that it would have been futile to contact a parent, who, according to uncontroverted testimony was a caring father during Alan's formative years and who provided his children with all the necessities while they were growing up. Indeed, several of the children testified that the testator offered a college education to each of the older children who wanted it.
If the testator had been the type of father who had been remiss or recalcitrant in providing support for his children during their formative years this court might give more weight to the argument that it was the father who caused the alienation. But this is a case wherein all the children attested to the fact that each had a close, loving relationship with the testator during their formative years. Parents and children owe each other the mutual obligation of love and respect. It is not incumbent upon the parent to seek to communicate with an adult child. In Succession of Cure, 633 So.2d 590 (La.App. 1st Cir.1993) the court stated:
... the proposition stated in Succession of Landry, 463 So.2d 681, 684 (La.App. 4th Cir.1985), that `frjespect between parent and child is a mutual obligation,' does not warrant, as appellants assert, that a testator must express that the failure of a child to communicate is "without just cause." Instead, the language contained in La.Civ. Code art. 1621(12) places the duty on the child to communicate with the parent when the child, knows how to contact the parent. In Succession of Bertaut, we observed the following: "It is also obvious that the Legislature intended to place the burden of making the effort to communicate on the child, since failure, not refusal, to communicate is the ground for disinherison." 572 So.2d [142] at 146 [(La.App. 1st Cir.1990)] (quoting Spaht, Successions, and Donations, Developments in the Law, 1984-1985, 46 La.L.Rev. 707, 712 (1986)). Accordingly, we hold that La. Civ.Code art. 1621(12) does not place an obligation on the parent to contact the child. Hence, a showing that the parent failed to contact the child generally will not prevent the disinherison. Rather, to escape the wrath of disinherison, La.Civ.Code art. 1621(12) provides the child the opportunity to challenge the validity of the disinherison provision by showing that "just cause" existed for not communicating with the parent. (emphasis added)
Id. at 593.
Alan's argument that his father's rejection of his siblings obviated the need for him to attempt to communicate with his father is without merit. Nor did his detection of a "subtle coldness" when he last visited his father in either 1978 or 1979 excuse his failure to communicate with his father. The following remarks of the court in Succession of Cure, supra, concerning the duty to communicate, even where the relationship with the parent is a strained one, are instructive:
... In Succession of Bertaut, we held that a child does not have to attempt to communicate with his parent when the attempt would be futile. 572 So.2d at 147. Furthermore, we decided that if attempts by a child to communicate with the parent are futile, any failure thereupon to communicate with the parent is with "just cause." Id. at 147. We reasoned that "[a] person should not be required by law to perform a vain and useless act." Id. at 147.
However, in Succession of Bertaut, we observed that "[b]ecause the legislation now imposes a responsibility upon the child to communicate with a parent, an argument that creates strained relations with the parent should not constitute `just cause.'" Id. at 146 (quoting Spaht, supra, at 713). In this light, we conclude that the failure to communicate with the testator was not with "just cause" simply because appellants claim that any contact with the testator at his residence may have caused a tense situation. Furthermore, we take notice of the fact that the disinherited sons failed to contact the testator at any other place besides his residence. (emphasis added)
Id. at 633 So.2d at 595.
*940 We do not find that just cause existed for Alan's failure to communicate with a father with whom he admitted he had a great relationship as a child.
Alan's loyalties during the latter years of his father's life were and remained with his siblings. His testimony contains not one shred of evidence to suggest that he attempted to discuss why Laurie was allegedly put out of the house or why his other siblings had allegedly been mistreated. This court can understand Alan's dismay at what he perceived to be his sister's dilemma, but seriously questions taking the word of an eighteen year old that her dad had arbitrarily thrown her out of the house for no good reason.
Moreover, Alan's testimony offered no support for the children's contention that the testator's testament was made out of hatred. Rather, it offered ample support that there was much hatred on the part of this witness, as well as several of his siblings, for Carol. Alan made no attempt to hide his extreme dislike for Carol. Such hatred for a person that he hardly knew appeared to be misdirected. This hatred was aptly expressed in the following response to a question concerning his reasons for participating in the litigation to nullify his father's will:
"I have one set of objectivestwo sets of objectives. I feel that a heinous crime has been committed against me and my family; that because of Carol's lies, her deviousness, and her manipulations of my father, she knowingly and willfully deprived myself and my siblings of a relationship with my father for personal gain because of her business objectives.
So to me, a heinous crime has been committed. It may not be, really, a crime, but, as far as I'm concerned, it's a crime against my family.
I'd like to think that there is some justice in the world; that justice would say that these crimes should not be rewarded by her getting everything. Justice should say that these times (sic) should be punished in some fashion; that she should not be allowed to get away with what she's getting away with....
I believe that she's getting away with the estrangement, the willful, and methodic, and devious estrangement of myself and my siblings for personal gain.... The second objective is there is a long legacy of the Morning Call being in the Jurisich family. My father inherited that business from his father, who inherited it from his father, who inherited it from his father.
Now, all of a sudden, because of manipulations of Carol, that legacy isn't going to occur? (sic) I don't really have any personal desire for the business, but I would like to see it kept in the family for the benefit of my brothers and sisters...."
Alan Jurisich presented no evidence to contradict the rebuttable presumption contained in the will that he failed to contact his father for a period exceeding two years; instead, he admitted that he neither saw nor talked to his father after the Lacombe incident was resolved. Since the Lacombe incident was resolved at the latest sometimes in 1979, Alan confirmed the truth of the statement made by the testator in his last will and testament that Alan Jurisich did not communicate with the testator for at least two years. Further, the reasons presented for failing to contact the testator do not constitute "just cause". Accordingly, the disinherison of Alan Jurisich is upheld.

DONNA JURISICH BRUMAT
Donna Jurisich Brumat was the second oldest child of the decedent and the oldest girl. She was forty-five years old on the date of trial and employed as a school teacher for Jefferson Parish. Donna testified that she and the testator were very close all her life. However, she admitted that at the time of her father's death, there was practically no relationship at all.
Donna testified that during her childhood her relationship with her father was wonderful. They were a close, warm, loving family and her friends often commented that they were jealous of her because of her wonderful family. Everybody would come to their house and want to be around them. They would all sit at the kitchen table, laugh and joke, and everybody would come to dinner. They had a beautiful family.
*941 Donna married and moved out of the house in 1969 and never moved back, but she remained close to her family. In 1971 her mother became very sick, and within six months, died of cancer. It was a devastation for the entire family. When her mother passed away the family members were extremely close. Donna went to the hospital every day prior to her mother's death. The family members took turns going to the hospital and she was there trying to help her father with the kids. All the children were present when their mother died. Her father was lost and she did anything she could to help him.
Prior to the time of her father's marriage to Carol all her siblings had a good relationship with her father. In fact they became closer to him because he was so lost and needed them. Her dad still had two young children at home: her little sister Laurie was only 12 and her brother Steve was 13. The children were all over there all the time and he was happy to see them. They were all there for dinner on Sundays. Donna testified that she frequented the house for two years after her mother died and cooked for her father every day and helped him with the clothes and kids. Her husband came over and brought food. Finally her father suggested that she take Sundays off as he could manage.
After that she still dropped by as much as she could and they constantly tried to talk to him about Laurie. Her father was at a loss as to what to do with Laurie and asked Donna and her sister Linda to help him with Laurie. They were worried about Laurie because her father just didn't know how to treat her, as a daughter. Stevie was an open child and easy to handle. But, Laurie and her father had the same personality and constantly had conflicts. She told him that he just had to be able to love Laurie. Every time her father had a question or was confused about something Donna responded to his request for advice. If her father and Laurie had an argument, she was there to advise him.
After her mother's death in 1971, they still had family gatherings. Everybody came over on Christmas. When her father started dating they were glad. He didn't seem to need them as much. He was lonely and they wanted him to find somebody so he could get married again. He was dating two people and eventually they were introduced to "this woman, Carol, that he had been seeing for about two years."
They did not understand why they had never met her before. She had called on the phone a few times and they really did not know her that well and it wasn't until they met her that Donna could see there was a change in her father. He didn't seem to need them as much and he didn't care about them as much. He did not pay as much attention to them anymore.
They tried to accept Carol and be friends with her. Everybody was excited about the upcoming marriage; but, she had some conversations with Carol that led her to believe that this was not the right person for her father. Donna spoke with Carol on the phone and Carol upset her. According to Donna, "She would provoke me, and I couldn't understand why she was doing this."
One particular conversation really bothered Donna. She described the conversation as follows:
Well, I told her that I was very happy my daddy was finally getting married; that I knew he was lonely, and I wanted to be her friend.
But I wanted her to understand that "Please don't try to be my mother, and don't try to expect me to forget my father. But I hope we can be good friends."
And the next thing out of her mouth was, "Oh, your daddy loves me so much. He loves me. He told me he loved me more than he loved your mother."
I was, like, "I can't believe this, Carol. Why are you saying this to me? This is It's so hurtful. I mean, how can you say this? My mother; he knew my mother for twenty-eight years. He's known you, maybe, two years. And you're going to tell me, his daughter, that he loves you more than he loved my mother? I'm sorry, I can't buy it. Look, I want to be your friend, but don't say things like that to me."

*942 So right off the bat, she provoked me.
In answer to a question by her attorney concerning what context these comments came up in the conversation, Donna went on to elaborate as follows:
Because when someone marries your father, you ... want them to understand that ... you want to be their friend and you respect them as your father's wife, but that ... there's nobody who could ever ... take [my mother's] place.
And I wasn't being ugly, I was just trying to let her know, you know, "Just please understand. Don't step over the boundary of mother or friend. I mean, you're marrying my daddy, but you're not my mother. I don't even want to consider you my stepmother. You're just my father's wife. I will do everything I can to make sure everything goes well."
But for her to say that, it was just immediatelyIt's like she pushed the wrongShe knew what buttons to push. She knew exactly how to bait you, right off the bat.
When her father asked for her honest opinion of Carol, Donna told him she knew he was lonely and she wanted him to be happy but she was afraid this woman was going to destroy their family. She told him she felt Carol was paranoid neurotic. According to Donna, her father put his arms around her and told her not to worry, he was not going to marry her. Yet, three months later, her dad and Carol married.
Donna was bothered by the way Carol constantly talked about Laurie and how much trouble Laurie was. Carol often talked about how Laurie and Henry, the boy Laurie was dating, were carrying on. Donna felt compelled to tell Carol:
I said, "Well, if I were Laurie"I mean, she was lucky that that's all she was doing. "She may be being late on a curfew, but the way daddy treats her, I wouldn't blame her no matter what she did."
This conversation occurred before her father asked how she felt about Carol. Prior to the marriage, the relationship with the other siblings was fine. They told Donna she was exaggerating and to give Carol a chance, and she agreed as she wanted to make her father happy. At that time, they still had frequent contacts with their father, although he seemed "a little colder."
Her father and Carol married on March 17, 1977, the day after her sister, Laurie, celebrated her eighteenth birthday. Immediately after the marriage things really changed. She explained the change as follows:
It changed right after, right after they got back from their honeymoon, which was my fault, and I'm sorry to this day. I will never forgive myself for what I did.
But at the reception at my parents' house, after they left I had a few drinks, and my cousin, Bobby, pulled out a marijuana cigarette, and I smoked a little bit of it. And a neighbor told Carol of this incident.
Donna testified that her brother Alan called her after her father and Carol returned and told her that Laurie was in big trouble because all of them were getting blamed for what Donna had done. He told Donna to "get over there, and ... straighten it out." According to Donna, Laurie was about to get beat up because she was being accused of smoking marijuana, that all of them had been accused, when in reality Donna and her cousin were the only ones smoking marijuana. Donna testified that it was the worst mistake of her life, but she had no way of knowing it would come to that. After talking to Alan, she went over there "to protect her sister and to take the blame".
As she was trying to tell her father she was sorry, her father started yelling at her and hitting and punching on her and throwing her out of the house. He grabbed her arm and was just hitting on her. She kept saying she was sorry, but by the time they reached the door her father remarked, "You would smoke marijuana in your mother's shrine?" Her response to this comment by her father was to inform him that her mother already knew about her smoking marijuana. If she had known at the time what making this statement would mean later, she would never have made it.
*943 According to Donna, she and her father made up three weeks later. Carol called and told her she thought her father was ready to talk. She went over and apologized again and told him she had too much to drink, and it was stupid. Then, she decided to tell him that he had to understand that she had tried marijuana before with her husband and that she had told her mother about it because her mother was her best friend. She further volunteered that the reason her mom had not told him was "she knew you would react and probably have gone and beat my husband up and what good would that have done?"
On direct examination, Donna denied consuming drugs for an extended period of time. She testified, "It was just a childhood thing you do." At the party she had a few too many drinks and when her cousin pulled out the marijuana, she thought it would just calm her down a little bit. When asked on cross examination whether she had smoked marijuana between the time she first smoked it prior to her mom's death in December of 1971 and the time she smoked it at her dad's wedding reception in March of 1977, she replied no. When asked if she had smoked marijuana since that time she replied. "No, I don't think; not really."
Donna testified that a neighbor had seen her smoking the marijuana and had told Carol. According to Donna, Carol lied and told her father that all of the children had smoked marijuana, when in fact, she was the only person who had been smoking.[5] Her father told her Carol told him about the incident and that Carol could lose her children over this. He indicated her ex-husband could take her children away but this made no sense to her. She and her father made up, but after this incident, the relationship was a lot colder. According to Donna, "There wasn't a gleam in his eye for me anymore."
According to Donna, she continued to see her father once or twice a week. She was invited to dinner or just dropped in. Donna testified that during this time:
I was concerned about my sister, Laurie. My daddy was getting to be unreasonable about the treatment of Laurie. All of a sudden, he was just punishing her for everything.
I said, `Daddy, you know, what is this?' I mean Laurie got punished for ... her high school prom. I mean, they all got a hotel room. Every kid in the city.(sic) If they're not old enough to drink, they're going to rent some room and have a party.
And that's what Laurie did, and she got punished for that. I tried to tell my daddy... I thought he was being unreasonable. And he told me it was none of my business. For five years he was constantly calling me and asking me what to do. Should he punish Laurie for `this'. How to handle `this'. And now, all of a sudden, it's none of my business. `Just stay out of it.'
This was the first time her father had ever rejected any of her advice regarding her sister.
Donna further testified that the family continued to gather as a family. They had a birthday party for her father in May. Carol called the children concerning a gift and asked if they would all put in for it and they did; but, they later found out that Carol had already given it to him. The day of the birthday party Carol started talking about her father wanting to change the locks in the house, as he was upset because all of them kept going into his house, and he was tired of it. Donna "got all upset" and asked herself why he was doing this and initially felt if that was the way he was going to be, why should she go to his birthday party. But "realizing that Carol was trying to upset me, I went anyway." She did not say anything to her father and stopped and bought him a present from her. She never asked her father whether Carol told him they had given him the other present as she was not going to let "this woman bait" her. She felt Carol was pushing buttons and trying to upset her and trying to prevent her from wanting to go to her father's birthday party.
*944 At this time Laurie and Stevie were still at home, and possibly Carol's son, Michael. Stevie was getting along okay with her father, but not Laurie. Laurie would call to tell her she was being harassed by Carol, who was constantly saying things to upset her (Laurie). Donna would call her father to ask what was going on with Laurie and to inquire as to whether everything was okay. Her father told her everything was okay and that it was none of her business.
She testified that her sister was punished for the prom incident and for having her friend Henry over for a pizza. According to Donna, their father came home from work and started beating both Laurie and Henry.[6] According to Donna, this incident demonstrated the influence Carol exerted over her father. During her childhood, her father never left work for anything. To illustrate how unusual the incident with Laurie was, she related the following incident:
My daddy worked the night shift at the Morning call. He was there like 10:30 to 6:30 in the morning.
I can relate to a time when I was fifteen years old, and didn't realize the seriousness of calling your parents.... It was my birthday, and I had gone with my friend to the show, and we met up with some friends, and we went for a ride, and we rolled somebody's house.
When urged by her attorney to get to the point, she continued:
The point is, I came home, and my poor mother was at the police station with my girlfriend's mother. And my neighbor was there, and I had to call my daddy at work and tell him, "Daddy, I'm home." He said, "If I could leave my business, you know what shape you would be in."
She stated that she apologized to her father for the above incident, but emphasized that the point she wanted to make by relating this incident was that her father never left his business. She believed that for her father to come home because Laurie was having a pizza with her boyfriend was "totally absurd." Moreover, Donna testified that "from what she heard", Carol had to have called him and must have really said something for him to come home and start beating her sister.[7]
Donna further testified that she knew "this woman was setting us up from Day-1." She stated that two weeks later there was another event with Laurie and this is when she knew "this woman was evil". She then related how Carol had gone into her sister's room and told her sister something unpleasant about their mother.[8] The end result was her sister was "kicked out the house", after having been beaten a second time.
According to Donna, her sister came to live with her and she had to go to an ophthalmologist because her father gave her two black eyes. She had contacts on and they cut or scraped the corneas of her eyes. They could not believe this. She talked to Laurie, her sister Linda and Peter about what to do. After her father "kicked Laurie out", Donna tried to talk to him, but he was very cold and indifferent. She tried to call her father on the phone but he did not want to talk about anything.
By July or August of 1977, Laurie was out of the house. Donna finally realized the real significance of the marijuana incident. She found out from her brother Peter that her father believed that his twenty-eight year marriage to their mother had been "a lie". Donna decided to go over there and "straighten him out." Donna testified, "I went over there and I wanted to confront my *945 daddy." She discovered that he had changed the locks on the house and she wanted to ask him why. When asked by her attorney if she was angry or did she try to have a peaceful conversation she replied:
At first, I tried to have a peaceful conversation with him, but then I wanted to confront him about this; about what he was saying about my mother. I mean, she didn't do anything. It wasn't fair.
After being cautioned by her attorney to "Calm down a second" and to slowly explain how the conversation began, Donna continued to testify as follows:
I said, "Daddy, I can't believe you changed the locks on your house. I mean, I just feel like you're just shutting us out completely."
Her father replied that she and her sister, Linda, had been coming into the house and Carol had stated that they were going through her things. She denied that she had ever done this and explained that she had only come one time without him being present, and that was to get her suitcases which he had allowed her to keep at the house since she did not have room for them at her house. She and her husband were going on a short vacation; she had knocked and nobody was home. So, she let herself in, grabbed the suitcase, and left a note. Donna then questioned her father as to whether he was accusing her of going through Carol's things. Her father asked if she was calling his wife a liar. She replied that she was not, that she was just telling him she didn't do anything. Her father refused to believe her and told her to get out. According to Donna, her response to her father's request to get out was:
I said, "Daddy, wait a minute. Before I leave, I've got to know something. Why are you saying your marriage to mama was a lie? What is making you say this"
When her father told her it was because her mother had not told him Donna had tried marijuana, she replied that he did not realize that there were certain things you kept from people because you loved them and did not want to hurt them. She reminded her father that he had done the same thing when there had been problems with Linda and he had not wanted her mother to know. According to Donna, her father knew exactly what she was talking about, and that she was right and "the only thing he could do was get up and start hitting me because he was so angry." She further asked her father where he got the idea that his whole marriage to her mother was a lie and questioned him as to how his wife got him "to believe that one." She stated what a fool she had been thinking Carol was her friend, while all the time Carol had been convincing her father that because of one thing her mother had kept from him concerning Donna's activities as an adult, his first marriage was a lie. Donna pleaded with her father not to take away her mother's memory.
According to Donna, her father responded with hostility and kept hitting her and almost knocked her out of the chair. As she was leaving the house he told her to get out of his life and that he did not want to ever see her again as she was not a part of him. He did not want her around.
Donna testified that her father had never hit her like that before her mother died or before he married Carol. In fact, she had never been hit since she was twelve. She understood getting hit at that time, but even when she was 15, he had not hit her. So she did not understand why he was doing it now, when she was not even living in his house. She discussed the incidents with her brothers and sisters and they were horrified.
After the last incident, she made one further attempt to contact her father. Her husband went with her to the Morning Call to try to talk to her father and he would not see her. There was no conversation between them. He just told her to get out. They went inside and her father was sitting by the register working. She tried to speak and when he saw her he just looked at her and told her to "Get out".
This visit to the Morning Call was made a couple of weeks after the second confrontation in 1977. Donna discussed it with her siblings and they did not know what they should do. It was getting close to Christmas and they were not going to have their father. They invited him to be with them and he declined. They sent a present which he returned *946 unopened. They celebrated Christmas by themselves, the six brothers and sisters and some aunts and uncles.
The next contact she had was when her father called her on the telephone in early 1978 and said in a very cold voice that he wanted her to know that he was selling Lacombe and buying a house in Mississippi so he could disinherit them. She begged him not to sell Lacombe; instead, she suggested a swap of the Lacombe property for the house on Louis XIV Street, the family home in which he was then residing. Donna denied that her father was having financial problems that required him to sell the house. This conversation took place about a couple of months after she had last seen her father. Donna testified that prior to the Lacombe controversy, she had not done anything to provoke her father, other than the smoking of the marijuana at his wedding reception. However, she thought they had reconciled over that matter.
Prior to the Lacombe controversy, she had never asked her father for cash of any kind for the properties. Even though the law said they owned half the property, they had never asked him to open their mother's succession. When her father initially informed her that he wanted to sell Lacombe she had conversations with her brothers and sisters immediately. Her brother Steven said "I'm staying out of it now." Peter also stated that he was staying out of it. She and her sisters Linda and Laurie decided to fight him and try to keep the Lacombe property.
She secured a lawyer and the sisters went before the judge and obtained an injunction preventing their father from selling Lacombe. Donna testified that she was not sure who went to court first, but when the judge told her father he could sell both properties owned in indivision or neither, her father became enraged. He could not believe the law could stop him from selling property he considered his own. After the judge stated that they would need to auction both houses or neither house, the children decided to let the matter sit for a couple of months and let their father think about the matter. They did not want their father to lose the house he was residing in, nor did they want to give up the Lacombe property. It was suggested that the children could buy Lacombe, but that was impossible. Only two of the children were working at the time and there was no way they could afford to buy the property.
During this time, she knew they were losing their father. Six months after his remarriage all of them had been wiped out of his life except for Steven and Peter, who still had some contact with their father. Steven was still living at home and Peter was working for their father at the Morning Call. Once her father was served with the injunction preventing him from selling Lacombe, Peter was fired from his job at the Morning Call.
When he was fired from the Morning Call, Peter came to live with her because he had contracted hepatitis. Her Uncle, Eddie Jurisich, was a partner with her father and co-owned the Morning Call at the time. When she called her Uncle Eddie to inquire about insurance, her uncle screamed at her about throwing her dad out of his house.
Donna testified that she did not have any personal conversations with her father during the legal proceedings. Initially she allowed the lawyer to handle it, and later after Peter was fired, he joined the sisters in handling the Lacombe matter.
Donna gave two separate explanations as to why the children finally "gave in and gave him what he wanted". First, she stated their father was stubborn and was going to lose his house if it had to be auctioned so they gave in. However, she also stated that the children knew they could not afford to buy the Lacombe property, so they gave in to their father's demands.
According to Donna, her father sold Lacombe, opened their mother's succession, gave them their share of the money and told them they no longer had any part of his life, that he was disowning them and never wanted to see them again. He paid them off and that was it. When asked how her father told her this, Donna testified, "I'm not sure if he called us, or if it was a letter from the lawyer, or what. But, I mean, that's basically what he was trying to do." After Donna *947 received her share of the money, she did not try to contact him "for a while" as she was upset and "just felt like it was futile."
She went to the Morning Call to see her father in September, 1978, when she and husband split up. He was non responsive and told her to get out, so she did. The next time she saw her father was a couple of years later, probably 1981 or 1982. She again went to the Morning Call and he was there. He was nice to her, hugged her and was warm. But, when she tried to come back to see him two weeks later, he was horrible. He told her to get out, that he wanted nothing to do with her. She did not understand what had happened during the two week period to cause him to change so quickly. She felt like he probably told Carol he had seen her and Carol did not like the idea. She assumed Carol probably talked him out of talking to her.
Donna testified that she thought she next saw her father around 1983. She went into the Morning Call late at night with a friend to give him a birthday card. She gave it to a man who she thought may have been Carol's son, Bobby Hennessy and told him to see that her father got it. Her father had not called her since the time he called to say he was selling Lacombe, nor did he call her after she delivered the card. She did not know if her father ever received the card.
She testified that the siblings continued to have family gatheringsbut her father would not have anything to do with them. Her father did not attend when her sister Laurie got married (this was probably in 1980),[9] nor did her father attend her brother, Steven's wedding in 1982, even though one of Carol's sons was in the wedding and was the best man for her brother.
Prior to Steven's wedding her Aunt called and told her Carol was concerned that she (Donna) was ill or sick and would she call her. She refused to call as she knew Carol was just trying to keep her father from attending the wedding. She knew Carol was using her first because "she knows I'm the one that reacts and gets mad, and then she can tell my daddy that I got mad at her and insulted her, so he won't go to Steve's wedding." She did not call Carol because she did not want to be provoked or cause any problems for Steve.
The children had no explanation as to why their father failed to attend the wedding until years later when they learned from Michael Hennesy, Carol's son that the reason her father did not show up was because her sister Laurie allegedly threatened to beat Carol. Donna thought that this allegation "was absurd!"
Donna also testified that her next contact with her father occurred when she dropped off some cards in 1983. There was also a phone call in 1984. Her dad was "ugly on the phone" so she decided it was not a good idea to try to talk to him on the telephone. She decided to try to see him in person.
Donna testified about seeing her father at the anniversary party for her Aunt June and Uncle Carl Dailey. This event occurred in 1985 and all the siblings attended, except Laurie, who was having a baby. Her father came in with Carol and she walked up to him and said something like, "Hey daddy, how you doing". He just looked at her and told her to get away from him as he did not want to have anything to do with her. She got mad and said, "Oh, I'm sorry. I forgot you have no family now, right?" She told him to look at his grandchildren standing over there that he had never picked up or seen and then tell her he did not have any family. She then walked off and her sister Linda walked up and ended up bearing the brunt of her father's anger.
In 1986 she wrote her father a letter and mailed it to the Morning Call. She told him she had gotten a divorce and had purchased some property. She never received a reply. Other than the 1986 letter, she did not write her father before or after.
She next saw him in either December of 1988 or January of 1989. She was not sure of the date. She went to the Morning Call *948 with her boyfriend and before she could even introduce him, her father told her to get out, that she was not his daughter, not a part of his life, and he did not want her around. While she was standing there a waiter came over and told her she had better leave because her father was going to call the police, she left.
Donna admitted that she did not try to see her father any place other than the Morning Call. She never tried to visit him at the house, not after being beaten up there twice. Her father was a hard working man, with not much of a social life. He worked long hours.
In 1989 her sister Linda called and asked her not to try to see her father at that time because she was trying to have a relationship with him and she did not want Donna to jeopardize it. She decided not to try to contact her father anymore. She went to the Morning Call one last time in January or February of 1990, but her father was not there.
Donna testified that her father did not want to have any contact with them and noted that he had altercations with her, Laurie, and Stevie prior to his death. According to Donna, the altercation with Stevie was a serious altercation. Donna testified that she was in court with her brother Peter when her father showed up and was sitting with her brother's ex-wife. This really hurt her brother. Her father saw her outside the court house and made no attempt to acknowledge or greet her. She did not recall any of them attempting to wave at him or say hello. She was in shock that he was there. Her father did not testify. Peter went home and called Stevie, who told her he was beside himself and tried to call his father on the telephone but her "daddy wouldn't come to the phone."
Donna testified that she found out about her father's death from her sister, Linda. She attended the funeral although they were not invited. Carol told Stevie that their names were not mentioned in the paper because their dad allegedly didn't want their names mentioned in the paper.
When asked by her attorney if she had any conversations of note with anybody at their father's funeral, Donna replied:
I spoke with my Uncle Eddie and Aunt Marian, and I believe I spoke toI spoke to a number of people, but I remember telling Lena WillisLena and Joe Willis were friends of my mother's from years agoI said, "Thank goodness," I said, "at least my daddy's at peace. He's where he belongs. He's with my mother, and, hopefully, my mother is bawling him out right now and then she's going to tell himshe's going to let him see that he was wrong; that we were not bad kids. That we did not do anything to hurt him. That we loved him. That we wanted him to be happy, and that we were always the same. We didn't change. He changed."
When asked by her attorney her beliefs concerning what made her father change, she replied:
I believe that the person that he married made him change. My father waswhen my mother was alive, my father was alwayshe would get angry and he would get mad, but my mother would always calm him down and get him to see our side of it.
But then, after he marries this woman, he's constantly angry. He never got over the anger. And how did my father change so much, if it wouldn't have been for the person that he was married to? My father was lost, and he needed someone in his life. And if this was the person he wanted to be with, that's fine. But with all these things that were being said about us, all the things that were done to us, all the lies, all the deception, everything that happened, if this woman wanted us to be together, then she would have made sure to let my father see our side; to keep our father from being so angry, just like my mother did.

But that didn't happen. My father was always in a rage. My father was a great businessman. My father was fine, accept (sic) when it came to the mentioning of our names. Whenever we came around, whenever we tried, no matter how many attempts we made to see him, he was always angry.
It's unfathomable to me to imagine that a man could stay angry the whole time he's *949 married to this woman, that he would bring things up that happened years ago that had nothingthat wasn't any big deal. (emphasis added)
Donna testified that she and all the siblings tried to contact her father numerous times after the settlement of her mother's estate, but it was futile. However, she admitted that it was possible that Alan may not have tried to contact their father. Their father hated them.
When asked if she believed she went longer than two years without seeing or trying to contact her dad between the Lacombe incident and the time her father died, she replied, "No. Maybe right at the Lacombe litigation, maybe at that time, but I tried over and over again after that." She went on to testify that if she did have a two year period of non contact, it was because it seemed so hopeless, it was hard to be rejected over and over. She just tried to put it out of her mind.
Donna testified that she did not believe her dad would have ever made a will disinheriting all six of his children on his own. Her dad's disposition toward his children changed "right after they got married." Donna expressed the following motivation for participating in the litigation:
I feel like our lives were destroyed; that we could have no relationship with my father for all those years that he was married to her. And that if she were a good person, that she would have welcomed us into the family; that she would have tried to help my father get over whatever anger he had for us, and she didn't do this.
Donna testified that her father never told her why he disliked her.
Based upon Donna's testimony, it is uncontested that there was no meaningful communication between Donna and the testator for at least two years on at least four separate occasions. The first relevant period is the period between September of 1978 when she allegedly visited him at the Morning Call and 1981 or 1982 when she visited him twice at the Morning Call. The second relevant period is the period between the telephone call of 1984 and the time she wrote a letter in 1986. The chance meeting at the anniversary party of the Dailey's in 1985 was not a contact initiated by Donna and certainly would not be considered an attempt at the type of meaningful communication required by La. C.C. art. 1621(12). The third relevant time period of no contact was from 1986 when she wrote the testator a letter to 1988 or 1989 when she allegedly visited the Morning Call again. The final relevant period of non contact occurred from 1988 or 1989 up until the testator's death in 1991.
Given the fact that the record supports a finding that Donna failed to contact her father for at least a two year period on several occasions, the issue of whether just cause existed for the lack of contact must be addressed. At first blush, the fact that Donna's father allegedly struck her on two separate occasions would seem to justify her not wanting to communicate with him. The act of striking one's adult child is not an act that can be condoned by this Court. Assuming arguendo, that the testator actually struck Donna on these two occasions, we are convinced that these two isolated instances of hitting (both of which occurred within three to four months of each other) were not the primary causes for Donna's failure to communicate with her father. Clearly, the hitting incidents were isolated cases as Donna testified that she had not been hit by her father since she was twelve years old. Other siblings testified that they could not recall being hit by the testator even as children. Peter recounted an instance from his childhood wherein his father had chastised him for striking one of his older sisters and had told him to never hit a girl, even if she was older. Thus, the alleged hitting by the testator was clearly unusual behavior on his part.
In the absence of testimony from the testator, this court has relied upon other evidence contained in the record to try to understand what could possibly have caused the testator to hit Donna. The answer is found in Donna's own testimony, the testimony of her siblings, and her obvious demeanor at the trial.
Donna described three separate contacts with her father which aptly illustrate the *950 troubled nature of her relationship with her father. All of the contacts must properly be characterized as confrontational. In the first, she visited her father intent upon apologizing for smoking marijuana at his wedding reception, and ended up telling her father that her mother knew she had tried smoking marijuana. In a second encounter, Donna confronted her father concerning a statement he had allegedly made concerning his marriage to her mother being a lie. In the final encounter at the anniversary party of 1985, even Donna's own siblings recognized that peaceful conversation was not possible between Donna and her father. Donna's accounts of her varied conversations with her father lead to the inescapable conclusion that Donna was extremely combative and had little or no respect for the father who she claimed had been wonderful in her childhood. Her remarks made to Carol on the telephone and about Carol at her father's funeral clearly demonstrate her total hatred for her father's wife.
Having read the remarks which Donna made during the various contacts, or more aptly the various confrontations that occurred between her and her father, we are convinced that the relationship between the decedent and Donna was strained prior to the incidents leading up to the sale of the Lacombe property. Clearly Donna was upset with her father for having married Carol. Donna was also extremely upset over the alleged mistreatment of Laurie, her youngest sister. More importantly, Donna appeared to be incapable of making an apology to her father without in some way making an inappropriate remark inciting her father in the process.
The fact that Donna was easily provoked and wont to be emotional was clearly demonstrated by the fact that her own attorney had to caution her, on numerous occasions to calm down and take her time while she was relating her side of the story on direct examination. Equally significant was Donna's behavior in the court room. While Carol was testifying concerning an incident involving the testator and Steven, Carol asked the judge to look at the appellants. Whereupon, the trial judge stated "For the record, Mrs. Brumat, please don't make any faces at the witness, okay?"
These factors lead us to find that her father may have been provoked by her constant confrontations with him. Her criticism of his parenting skills in matters involving her younger sister, her dislike of his new wife, her attempts to show that his beliefs were wrong, her sarcastic remarks to her father at the anniversary party in 1985, and her continuous conversations challenging her father at every turn were acts that tried his patience. Her apparent need to confront her father at every turn did nothing to calm the already charged atmosphere that existed when she was around her father. The fact that she was an adult when these confrontations took place makes it all the more difficult to understand what she hoped to gain through these confrontations, other than the total alienation of her father, a goal she ultimately attained.
Donna's constant barrage against her father and Carol at trial more than a year after the decedent's death leads us to question the nature of this child's attempts to communicate with her father. Donna testified that she attempted to see her father on several occasions at the Morning Call. George Brumat, her former husband, and Tommy Mason, her boyfriend, corroborated these attempts. However, while both testified as to the testator's reaction to her attempts and her reaction after the attempts, neither witness heard the context of the actual conversations between Donna and her father. Her Uncle Edmond, who worked at the Morning Call, testified that he had not seen Donna at the Morning Call since the Morning Call opened up in Metairie (in approximately 1973), thus he could not testify as to the nature of the conversations that occurred between the testator and his daughter.
Considering the nature of the known exchanges related by Donna Jurisich Brumat, we are unable to conclude that this appellant made any sincere attempts to communicate with her father in a peaceful manner as contemplated by La.C.C. art. 1621(12) at these later dates. The burden of proving the existence of just cause for a failure to communicate within a two year period rests on *951 the forced heir. Donna failed to meet this burden. Consequently, the disinherison of Donna Jurisich Brumat is upheld.

LINDA JURISICH MOLLERE
Linda Jurisich Mollere testified that she was the third child and the second eldest sister. Their family had a good normal home life during her childhood and she and her father were particularly close. She left the household in 1969 when she married and moved to California with her husband, who was in the service. However, she kept in very close contact with the family. She came back home in 1971 when she had surgery and the plan was for her to recuperate at her parent's home. However, when she returned from California, she found her mother in the hospital. They recuperated together. When her husband was transferred to Okinawa for a year, she stayed in the family home after her mother passed away. She took over the motherly role in the house and helped to raise her sister Laurie. She stayed until 1972 when her husband returned from Okinawa. Then they moved out and into their own home. Subsequently, the marriage fell apart. She and her husband eventually separated, and she moved back into the house with her father. This was around the end of 1972 or the beginning of 1973. She stayed in the family home until her father announced he was going to remarry.
During this time period there were no problems with any of the children. Her father worried about raising Laurie, but really there were no problems with Laurie. Laurie was a good student, participated in all the extracurricular activities at the Catholic school she attended and had a good set of friends she hung around with.
Everything changed after the marriage to Carol. Her father was always angry and held a grudge. The situation with Laurie changed drastically. Laurie never had a curfew before and always came home on her own at a reasonable hour. However, all of a sudden she had all those rules and regulations to follow.
Also, after the marriage, their father took away the keys to the house that they had lived in all their lives. Carol told their father they were coming in the house going through her things. This was preposterous. Carol also told her father that Laurie was sneaking guys into the house during the middle of the night which, as far as Linda knew, Laurie had never done.
Carol called her incessantly to tell her all the terrible things her father said about them. Her father called her only once to instruct her to bring some record albums that belonged to her mother and leave them on the front step; that he didn't want her to ring his doorbell. He gave no reason for his bad mood but this was probably near the time of the settlement of her mother's estate.
The Christmas after the marriage the children were not invited to their father's house so they sent Carol and their father a gift; it was returned to her sister Donna unopened.
Her father stopped contacting her. The only thing she recalled doing that she knew upset him was asking her Aunt Audrey for a loan for her sister Laurie to go to school. Laurie was enrolled in school with a dormitory room when, two weeks before she was ready to go, their father refused to give her the money. He had offered a college education to each and every one of them and had promised this to Laurie and she could not believe he changed his mind. She thought it was terrible and she asked her aunt for a loan so Laurie could go to school. When he found out, he was furious. He told her he did not want her around, as she was interfering. Forest Villarubia[10] and Audrey Villarubia [11] both corroborated the fact that the decedent was very angry that Linda had asked her Aunt Audrey to lend Laurie $600 to enable her to attend LSU.
According to Forest Villarubia, the testator came to see him at his place of employment near Christmas in 1977 and asked him to sit in the car and talk to him. The testator then proceeded to chastise him for having loaned Laurie money for college and guaranteed xthey would never get the money back. *952 At that time the testator was "downing all the kids". He said they were no good. Both Forest and Audrey Villarubia testified that they were close to Linda. She was always calling Audrey and coming over to bring her gifts for Christmas and for her birthday.
Linda testified that she had no further contact with her father until 1980 when she went to the Morning Call late at night, sat down and talked to him a long time. She asked if she could do something to make it up to him and he said no, that he was perfectly happy with things the way they were.
The Lacombe incident was upsetting but it was her father who was adamant about selling the Lacombe property. They tried to make a deal with him, swapping off the properties, but he did not want to, so they all signed over all their rights to him. They consulted an attorney in response to his proposed sale of the Lacombe property. Her understanding was that it came down to putting both houses up for auction or none at all and they chose none at all because they did not want him to lose his home. They just did not want to lose the Lacombe property themselves but he said he wasn't going to let them get the Lacombe property. She did not ask her father for money. It was her father's idea to give them money. She did not ask her father to pay any kind of rent on the family house on Louis XIV Street. She and each of her siblings received $13,000.00 from the sale of the Lacombe property. She was not happy with the money.
After reading the will at the instruction of the attorney, Linda testified that "As far as the two years are concerned, there was only one point in there where I feel two years went by, and that was between 1980 and 1985". After she visited her father at the Morning Call in 1980, she did not see him again until probably 1985 at her aunt's anniversary party. At that time, she tried to talk to him again, but was rejected. The reason she did not see him between 1980 and 1985 was because he told her nothing was going to change. In 1980 she was 29. She knew of her siblings' efforts to try to contact her father and that they were unsuccessful.
After the anniversary party in 1985, she did not try to contact her father again until about 1987. He called her two years after the party to yell at her about something concerning her brother Peter. After that she wrote him a letter saying she would be there for him if he wanted or needed her but if all he could do was call and yell and scream at her, she didn't want to hear it. She identified a letter dated April 23, 1988 as the first letter she wrote her father. In that letter Linda wrote:
Dear Father,
I thought it would be better to write this since I get too emotional to talk to you. I just want you to know where I stand and exactly how I feel.

A few years ago I went to you to ask you if you could be my father again or just be my friend and you said no. You said that you were happy with the way things were and you wanted me to leave you alone. So I respected your wishes and I have left you alone. Now I wish you could do the same for me since all you can do is use me and abuse me. You feel that you can reach out and call me every few years to slap me in the face. To demand some record albums back or to pass on a message. But I'm not at your disposal anymorenor anyone else's.
I somehow get the feeling that you think you're the only one that's been hurt. You don't know how deeply you've scarred me... how much pain you've inflicted on my life.
This doesn't mean that if you really wanted me, really needed me as a friend or "God forbid" as a father, I wouldn't be there. Because I would always be there for my father, I love him. But not for you. I refuse to let you hurt me anymore. I've had all the pain that I will allow. I'm not everyone's patsy anymore. I'm me. I'm a loving, caring person. And I want no part of anyone's bullshit anymore.
 It's over.
 Linda
Linda did not attempt to contact her father in the two years between the anniversary party and the phone call because she was scared of being rejected again. After the letter, she made no attempt to contact her *953 dad until right after his seventieth birthday in 1989, when she wrote a second letter in 1989. She also sent her father a couple of cards and some pictures of the family. An exhibit dated 6-15-89 contains the following letter written on a Zantac 150 memo pad:
Dear Dad,
I've been thinking of you a lot since your birthday. This was a real mile stone year for you. And I still can't believe that it's over a decade now since we've been friends.
Maybe you can be content to keep it this way but I can't. A one-sided relationship is better than none at all.
So I'll be writing to you from time to time. I won't get too deep or too heavy. Just friendly.
I've enclosed the latest photo of your family taken at Easter. I've listed the names on the back. It's your's (sic) if you want it, or whatever.
Anyway, I hope you have a happy father's day.
 Your daughter,
 Linda
 6-15-89
Linda sent pictures of the children as they were born. When they adopted a son, she sent a note with the picture of the baby and even brought her son to her father's house in late 1990 or early 1991. At that time she seemed to be welcomed into the house and had a nice conversation with her father. He played with the baby.
Her father was cool but receptive. Linda further testified that Carol was nervous and came in and introduced her to her nine cats one at a time "for the nine children that they lost." Her father did not ask her to leave or tell her not to come back. She felt successful since he spoke to her in a civil tone. After her visit, her father was in the hospital twice, and she went to the hospital to visit him on a couple of occasions. She also talked with her father on Father's Day in 1991.
Linda found out her father was hospitalized for the last time from her boss, Dr. Kokemor who was on call for the patient he was seeing in ICU at Baptist Hospital. When she got to the hospital her father was dead. She attended her father's funeral.
Linda testified further that her therapist had recommended that she not attempt to speak to her father, as she would be setting herself up to get hurt again. Nevertheless, she kept trying to contact him.
She further testified, "I feel I had just cause because he told me he didn't want to see me again. He told me he did not want to change our relationship in any way." Linda testified that the statement made in the will that as of November 22, 1988, she had failed to contact her father for a period of two years without just cause was false. It was also false that none of his children had contacted him since the settlement of the estate of their mother in the late 1970's. She adamantly argued that her siblings tried to contact their father, but she admitted she had not personally witnessed any of these attempts.
Linda also testified that she believed Carol influenced her father by twisting everything around that they had said and she went back to him and everything was blown out of proportion all the time. She admitted on cross examination that when she got to the hospital Carol was there and her father had just died.
The facts concerning Linda are most unfortunate. Linda unquestionably made numerous sincere attempts to reconcile with her father in later years and unfortunately, was rejected. This court is of the opinion that a more reasonable father would have chosen to reconcile with Linda because of her tenacity in attempting to maintain a relationship and her obvious concern for her father during his later years. The decedent, however, did not choose to reconcile with his daughter, either orally or in writing. This court cannot ignore the testator's wishes and effectuate a reconciliation where there was none.
Linda quite honestly admitted that she did not attempt to communicate with her father from 1980 to 1985. Moreover, her brief exchange with her father at the Dailey's anniversary party in 1985, like Donna's exchange at that same party, cannot be considered the *954 type of meaningful exchange required under La.C.C. art. 1621(12). This was not a meeting initiated by Linda, but was simply a chance meeting. In reality, the period of non communication for Linda was actually from 1980 to either 1987 when her father called to yell at her about Peter or April of 1988 when she wrote her father a letter. Further, in reviewing Linda's testimony, we cannot determine if she had any contact with her father between Christmas of 1977 and 1980 when she went to see him at the Morning Call. Her testimony did not affirmatively mention any contact during this time period. If not, certainly that would have constituted yet another two year period where no communication took place between the testator and Linda. Since a two year period undoubtedly ran during which Linda admittedly did not contact her father, the grounds for disinheriting Linda must be upheld.

Peter Jurisich
At the time of trial Peter Jurisich was 38 years of age. He testified that he was the fourth of the six Jurisich children. Peter testified that he and his father had a great relationship during his upbringing. On weekends, he and his father often worked together at the Lacombe property. When Peter played baseball, his father came to see him play. His father provided for all of his education.
Peter testified that his mother died in 1971 when he was nineteen. He was twenty-one or twenty-two years old when he moved out of the family home in 1973 or 1974, but has always lived in the City of New Orleans.
They had a happy family until his father married Carol. He initially liked Carol when his father started dating her and he supported the marriage. However, after the marriage, "things went downhill."
Peter testified that he formerly visited the family house almost daily but slacked off after the marriage because of the problems that now existed. The relationship with his father had changed. Two months after his father's marriage to Carol, his younger sister Laurie had two black eyes and was thrown out of the house, and his sister Donna had been beaten twice. This was strange to him because when he was a kid he had punched his sister Linda in the stomach once and his father had pulled him aside and told him never to hit a female. His father told him that even if he was younger than his sister, he was not to hit her.
Although Peter was not present to witness the incident with Laurie, he saw her black eyes. However, he was present when his sister Donna was beaten and he actually saw his father hit his sister in the face. His father had never hit any of his sisters before his marriage to Carol.
Peter testified that "he knew Carol had something to do with his father hitting Laurie". The reason he knew was that "she lied about Laurie". As proof of this fact, he testified that his father had never left work before in his life, but that Carol had called his father at work and all of a sudden his father "comes home like a raving maniac, and gives my sister two black eyes." According to Peter, his father never acted like that prior to the second marriage.
Peter testified that the other incident which illustrated the change in the relationship with his father occurred at the wedding reception. His father said they were all "smoking weed." His father talked about this for years and was outraged. Furthermore, Carol kept bringing up things about Donna, Laurie and Linda and getting his father "all fired up." Another change he noticed was that when he would call his father he would be talking to him pleasantly and all of a sudden his father would resort to yes and no responses. When asked if Carol had walked into the room, his dad would say yes. At this point Peter would tell his father he would talk to him at work. This happened on several occasions.
According to Peter, when anything started with his father, "Carol just kept it up and kept it up and kept that fire burning." In the beginning he received calls from Carol, usually at the Morning Call, but after a while he wouldn't listen to everything that was said. He got tired of hearing from Carol because of all the turmoil he felt she was causing.
*955 He also testified that Carol "pitched" all the family albums with all their baby pictures. In response to a question concerning how he knew Carol had done this he replied, "Who else did it? My father certainly didn't do it. She was the one cleaning up the den." Peter admitted that he did not ask Carol about this as he would be wasting his time. However, he knew the pictures could not vanish in midair and not one of his brothers or sister had them.[12] Carol denied taking or disposing of the family albums.
The next problem, according to Peter, was the Lacombe incident. Peter testified that the property in Lacombe was acquired by his father and mother when they bought out his other aunts and uncles, the Villarubias and that his father had wanted the house to retire in with his mother. However, after he married Carol, his father wanted to sell the property. The Lacombe property had been his mother's house and they wanted to keep it. He believed Carol did not want to have anything to do with his mother's house. According to Peter, Carol talked constantly about wanting to move to Mississippi. He believed Carol influenced his dad because she always talked about Mississippi. She didn't like the Lacombe property and after the marriage she started talking about Mississippi and inheritance laws and his father was always fired up about all of the kids, and he immediately got into the "Mississippi rile" and was convinced that was the thing to do.
Peter further testified that he was employed at the Morning Call from 1974 or 1975 through either 1978 or 1979. He was terminated from his employment the same day his sisters filed the petition trying to stop the sale of the property in Lacombe. Although Peter had not signed any pleadings and had nothing to do with this litigation, he ended up getting fired.
Prior to that time, there was talk of he and his cousin, Eddie, taking over the running of Morning Call, the family business. This was going to be his career. His father and he had discussed Peter and his cousin running the business and allowing his father and uncle to retire. They had talked about it both before and after his father married Carol.
Peter further testified that his relationship with his dad was fine up until the Lacombe incident occurred, except for one occasion, wherein Carol had told him that his father had called Laurie a no-good lousy tramp. Under his breath, Peter had called his father a "son of a bitch", and Carol had repeated Peter's remarks to his father. His father did not talk to Peter for two to three weeks and Peter finally asked him what was wrong. Peter explained to his father that his remark was made in response to a remark made by Carol indicating that his father had called his sister a tramp. He reminded his father that he knew how overprotective Peter was of his little sister. According to Peter, his father let the matter drop after he heard this explanation from Peter and understood clearly that Peter had made the remark under his breath.
Peter testified that this incident demonstrated how Carol influenced his dad "Because he was very angry at me. He was very angry at me because it's something Carol said. Carol convinced him to be angry at me." Yet, according to Peter, after he explained the circumstances to his father, everything was fine again, until the day his father fired him.
Although Peter maintained that his firing was in response to either the incident involving the Lacombe property or Carol's wanting him out of the family business, the testimony of other witnesses suggests that other factors could have been involved. His Uncle Edmond, who at the time was a partner and worked at the Morning Call, testified that Peter was fired because he wasn't doing his job. Leon Sorci, a close friend and former employee of the testator testified that the testator told him his children were no good and that Peter was on dope and even sold dope. He testified that he knew Peter smoked marijuana, but admitted he never saw him smoking it, but surmised this from *956 having seen Peter, with his eyes looking shiny.
Peter's explanation of his termination provided yet another set of factors which may have figured into his father's decision to fire him. Peter testified that his father told him the precipitating event causing his termination was a discussion with one of the waiters at the Morning Call. Peter recounted the following conversation which he had with his father on the day of his termination:
He called me in his office and he sat me down, and he said, "I don't need your services anymore." I said, "What are you talking about?" He said, "You told the waiter that you didn't trust me." And I said, "Dad, all right, I made a mistake. I did say that," I said, "but what I meant was I don't trust your judgment right now, and, as your son, you should have asked me about it."
Peter further testifies that he did, in casual conversation, mention to Tom Gross, a waiter at the Morning Call that he didn't trust his father's judgment. Peter further stated:
And after he fired me, I said, "I tell you what. I did say that, and I'm sorry. But you should have approached me with it. But guess what? You're showing me I am correct."
In response to his attorney's question concerning his motivation for telling this person he didn't trust his father, Peter stated that all the "off-the-wall things his father was doing with his brothers and sisters" led him to reach this conclusion. He further stated that his father did not overhear him make the remark, rather, the waiter told his father. Peter did not believe his statement could have undermined his father's authority at the Morning Call since it was not made in front of other people, just the waiter; and the remark had nothing to do with the business, but was related to his father's personal life. Peter admitted, however that it was possible he did not make it clear. He was not sure. Up until his termination, he had no problems at work. In fact, he had even received three raises while he was there. He had never been warned of any problems with his work.
Peter opined that his father was not mentally well when it came to his sisters, rather he was a "raving maniac". As proof that his father was of unsound mind, he also testified that his father tried to pistol whip his little brother, Steven, and he showed up in court with Peter's ex-wife, which did not seem like a sound thing to do.
The incident involving the court appearance particularly galled Peter as he recalled the reaction he received when he dropped by the Morning Call in early 1983 to tell his father he was going to be a grandfather for the first time. His dad said it did not concern him.
Peter's testimony concerning the times that he attempted to contact his father was somewhat vague and inconsistent. Initially, Peter testified on direct examination that at the time of the custody battle around 1987, his child was three or four years old. However, on cross examination, appellee's counsel called his attention to statements made in a previously taken deposition wherein Peter indicated the custody battle for his child was in 1986. When asked if the custody battle could have occurred as early as 1986, he replied, "Yes, I think it was about `86. It could have been `87, though." The date of the custody battle was a date which should have been easily obtained by Peter from existing court records or other documents. Yet Peter obviously made no serious attempts to assist the court in determining the time periods of no contact with the testator.
However, the circumstances concerning his contact with his father during that eventful time period is clear. Peter testified that his father showed up in court and was sitting with and talking to his ex-wife and her attorney. Peter discovered that his ex-wife had taken the child to see his father. His father did not initially speak to him. When he asked his father what he was doing there, he replied that Peter's ex-wife had requested that he come and that he was there for moral support for Peter's ex-wife. Peter asked his father if she had asked him to jump off the Mississippi River Bridge would he have jumped, and asked if his father could give him a better answer than that, but his father could not.
*957 Notwithstanding this incident, Peter testified that he still attempted to see his father. He testified that he did not believe he saw his father after `1987, but he talked to him on the telephone. The last time he attempted to talk to his father was in either 1990 or 1991. He called the Morning Call, but every time he called, his father was not there.
Peter's last conversation with his father in 1987 lasted maybe fifteen to twenty minutes. They talked about a little problem that he (Peter) had with his stepson, Michael. After being directed by his attorney to keep his answer relevant to the facts of the case, Peter stated that the conversation had nothing to do with the case. However, when asked about the conversation again, he states, "All we were doingI was just letting him know there was no real problem. Everything was blown out of proportion." He called his dad again that same year and he thinks 1987 was the last year he was able to get in touch with him. He always called at night after 11:00 p.m. during the week, late, because he knew he wouldn't be busy. However, his father wasn't there anymore. Peter admitted years ago he would describe his father as one to offer apologies and explain himself if he was wrong.
Peter denied that the statements in the various wills contending that the children did not contact him for a period of at least two years were true. He saw his father a few times between 1983 and 1987. It was hard to say the exact dates, but he saw him maybe 2-3 times. He also steadfastly maintained that he called his father and attempted to see him at his place of business. The calls only lasted about thirty seconds; his father usually terminated the calls. When he saw his father at the Morning Call, Carol was not present. However, his testimony was extremely vague concerning the dates and times that he allegedly called his father.
Peter ultimately admitted that he had no "first-hand evidence" to support his allegation that the alienation from his father was a result of Carol's influence on his father. However, he argued it was significant that one by one his brothers and sisters lost their father.
Peter testified that he believed his father would make misrepresentations in his will because of Carol's influence. However, his sole reason for believing that Carol influenced his father to make misrepresentations in the will was the following:
Well, she ends up getting the house in Mississippi. Ends up getting me out of the family business, which has been a business in my family for over a hundred twenty years, and it ends up that her sons are now running my family's business.
She got everything she wanted. She got the house. She got rid of us. She got my family's business. She got everything.
In addition to not seeing his father after 1987, Peter Jurisich admitted that he did not attend his father's funeral. Peter's sister told him his father had died. He further testified that Carol "did not have the decency" to tell them that their father was sick and dying in the hospital. He would have liked to have seen his father while he was sick in the hospital, but no one told his children that he was sick. He had no contact with Carol in the year or two before his father died and he had no contact with Carol after his father died. Peter gave the following reason for not attending his father's funeral:
I lost my father fourteen years ago. I just did not want to see him dead. It was over. As soon as he married Carol, it was over. I was hoping we'd get back together, and he died, and he just didn't give us a chance. I just didn't want to face it.
Before his father died, he did not give up trying to contact his father. He always tried to call. To his knowledge none of his brothers or sisters gave up on trying to have a relationship with their father. Peter described his motivation for participating in the lawsuit as follows:
That's easy. Carol took away my father. Carol took away my career. She got everything from start to finish. She got everything, and took everything away from us, and she does not deserve it.... I consider her a thief.
When asked if he hated Carol, his stepmother, he answered "Yes". He further *958 stated that he started hating her when she took his family apart. He could not give any specific dates but as of the date of trial he still hated her as he did not get to be with his father because of her. Peter was questioned about a statement made in a previously taken deposition to the effect that "We just wished she would have died first. Then we would have probably got our relationship back with him". When asked if he believed this to be true, Peter responded that he did not wish death on anyone but what he was saying was that this was probably the only way they could have reestablished a relationship with their father.
Peter admitted that the last time he spoke to Carol Jurisich was probably before he got fired, probably in 1979. The last time he saw his father and Carol together was at his Aunt June and Uncle Carl's anniversary party. He was going to talk to his father but when his father rejected Linda, he concluded "why try."
Peter testified that Carol wanted him out of the family business. He admitted that he did not have any facts to substantiate this opinion. However, he recalled hearing Carol say something about his losing his job before his termination.
Peter repeatedly testified about attempts to talk to his father, but stated that his father was not receptive. He believed his father was under duress, starting two months after he got married. It all started with the incident with Laurie and after that, according to Peter, it was just one thing after another up until the day his father died.
The burden of establishing that no two year period passed when he failed to contact his father rested with Peter. The evidence does not support a finding that Peter met this burden. Peter was inconsistent about several of the dates and the overall evidence supports a finding that he had no contact with his father from the time he was fired in 1978 or 1979 until at least 1983. Although he clearly saw his father at the anniversary party in 1985, this was not a contact initiated by him, and even if it had been, the two year period would have already run. Further, his generalized testimony that he saw his father several times between 1983 and 1986 is not sufficient to negate the irrebuttable presumption created by the allegation contained in the will. The disinherison of Peter Jurisich is upheld.

Dr. Steven Jurisich
Dr. Steven Jurisich testified that he was the second to last child and the youngest son. At the time of the trial he was thirty-four years old. Steven testified that he and his father were very close and that he was probably always considered his father's favorite child. When his mother died he and his sister, Laurie, lived at the house with his father. He thought his sister Linda also lived at the house "on and off." Steven and his father did a lot of things together.
Steven was about fourteen years old when his mother died. He absolutely supported his father's marriage to Carol and so did his brothers and sisters except, perhaps Donna. Carol was always friendly to him and he never witnessed his brothers and sisters show disrespect toward Carol.
The first time he noticed the family relationship was changing was probably a couple of months after his father married Carol and the incident occurred with his sister, Laurie. She was punished for coming in late from the prom. He was working for his father at the time and was living at home. One night he was in bed sleeping and he was awakened by sounds of yelling and screaming. He ran upstairs and observed his father punching his little sister. He placed himself in the middle and tried to stop his father from hitting her. His father said his sister deserved it. His sister was yelling for his father to leave her alone. This was unusual because other than a slap on the back of the head, his father never abused anyone physically.
Additionally, his father's relationship toward him started to change. Previously they had been best friends; but when he moved back home in December of 1977, there was a chill in their relationship to the point that Steven did not feel he could ask him for tuition and his father didn't offer to pay tuition anymore. Steven testified that his *959 father financed his first year of college, but he financed his education after that.
His father married Carol in March of 1977. At that time Steven was attending school in Baton Rouge, but living at home on the weekends. He had been home during the summer working for father at the Morning Call. He moved home in December of 1977.
Steven testified that his father was upset when he heard that his sister Donna had smoked marijuana at his house on the day of his wedding. He was there when his father found out about the incident. He thinks his father found out about the incident from his neighbor across the alley, Ms. Miller, who was there at the wedding reception. He heard his father and Carol talk about the incident at the wedding reception three or four times over a period of time which was unusual for his Dad who usually talked about something and that matter was forgotten. However, his father talked about this incident for over a year.
Steven decided to leave LSU and move back to New Orleans to attend UNO. One weekend when he was home, he overheard Carol on the phone telling her stepmother that she wasn't going to allow him to move back into the house. He told his father who said he would get back with him. The next day his father told him to go apologize to Carol because he had talked to her and she had said that was not what she had said. He apologized to Carol, and talked to her about the matter. She told him that she was referring to her son, Michael, because he was in the same situation. Both were at Baton Rouge and both were going to change and go to UNO. Eventually both Steven and Michael were allowed to move into the house.
His father came up to him one day and said he wanted to sell the house in Lacombe. He was surprised, as his father had previously talked of retiring over there and had put a lot of time and money into the place.
One day his father was angry about something. He made a reference to buying a home in Mississippi and moving there. Carol talked about buying a house and moving to Mississippi because there were no inheritance laws in Mississippi. This conversation took place before his father actually sought to sell Lacombe. Steven testified that Lacombe did not mean anything to him, and that he was not sentimental about it. His father picked him up and often brought him over there to work. Consequently, he never got any enjoyment from the place and didn't really care if his father sold it; but, it meant a lot to his brothers and sisters. It was where his mother and her sisters grew up. He did not hear his father mention anything about Mississippi inheritance laws, just Carol. Carol also mentioned she did not like the house in Lacombe.
After his father married Carol, the living arrangements in the family home included Laurie and Steven, and Mike and Bobby (Carol's sons). He was expected to cut the grass and paint the house, but they were not. His father did not seem to have any expectations of Carol's children. His father was harder on him and Laurie than on Mike or Bobby.
Steven further testified that his father kicked Laurie out of the house. All Laurie had done was stay out late at a prom and kept her boyfriend in the house past 11:00 p.m. He recalled hearing Carol refer to Laurie as a slut. Carol stated that Laurie was in the house "doing stuff" under her dad's roof. Carol often called and talked to Steven and he talked to her in person. He was living in the house when his father announced he was selling the Lacombe property. Over the next several months, things deteriorated pretty quickly. There were no more warm conversations. His father didn't talk about anything anymore. Conversations mostly consisted of just yes and no in response to comments.
Steven had very little direct involvement in the sale of the Lacombe property. Rather, he stated:
I was informed that I was to sign a paper one day stating that he could sell the house, and he was kind of in a real bad mood that day, and he was talking about that (sic) he didn't understand how he had to get us to sign this paper, because it was his money that was used to buy Lacombe, and he's the one that worked for the money, and he didn't think there was any *960 reason why he had to get our permission to sell it.
He was kind of appalled at the laws that stated that he had to get our permission.
Steven testified that there were several papers to sign. He signed one paper but did not sign the other. He could not remember the reason for two papers.
His father was not having financial difficulties and the only reason he knows of for the sale was the new wife did not like it and did not want to live there. To the best of his knowledge his brothers and sisters never asked his father to settle his mother's estate. Neither he nor his siblings ever asked his father for rent on the Louis XIV Street property.
Steven testified that his father did not attend his wedding in 1982. However, his father and Carol did go out a week before with his in-laws. According to Steven, Carol expressed concern about coming to the wedding, saying Donna had threatened to beat her up. Donna denied it, but he withdrew Donna's invitation and told Carol that Donna was not coming. His father and Carol still did not attend the wedding. Carol testified that she had nothing to do with Steven's father's decision not to attend his wedding. In fact, she testified that her son was in the wedding and she had bought a new dress and was ready to go. Her husband cautioned her about going, telling her that Steven was okay, but that as to the other four, "she would be like a lamb at the slaughter."
Carol also testified that her husband did not want to go to the wedding because at the time that Steven was preparing to get married her husband was still working at the Morning Call. He came home angry one day and told her that all the waiters at the restaurant had told him that his son, Steven was getting married. Her husband was very upset because everybody knew about the upcoming marriage, except him. When Steven finally asked him to attend, her husband told Steven that he should have been the first person he told about the wedding, not the last. Carol testified that although she did not attend the wedding, she sent a gift from D.H. Holmes.
Steven testified that he also invited his father to his medical school graduation in 1988, but his father did not attend. Carol testified that she did not recall seeing an invitation come to the house for Steve's graduation from medical school. Steven testified that he visited his father regularly all the way up to around 1991.
However, Steven was extremely vague about dates and the content of the conversations. At least two witnesses testified that Steven was always asking his father for money. Further, this court cannot determine what type of contact Steven had with his father after leaving the house in 1981 or 1982. Carol admitted that Steven often came to see her and that she saw him outside sometimes and he appeared to be talking to his father, but she could not place any dates on these conversations. Steven's wife Joan testified that she was a regular visitor at the Jurisich house prior to the time Steven moved out, but not after that. She also stated that she was present when the testator received an injunction or some kind of paper with the children's name on it and started yelling at Steven and told him to leave the house. She also recalled seeing the testator and Carol at the Daileys' anniversary party in 1985. She and Steven went up to speak to his dad with their daughter, whom the testator had never seen. According to Joan, their daughter was about a year and a half years old at the time. Joan Jurisich testified that the testator spoke to them cordially as you would an acquaintance, but not like a son.
Steven testified that the statement in the testator's will concerning the children not having any contact with the testator since the estate of their mother was settled was not true. He actually still lived in the house with his dad for several months after the settlement (even though things were apparently "icy"). He did not move out six to eight months after Carol and his father married. It was actually six to eight months after the Lacombe settlement, about 1978 or 1979, when he moved out.
Steven's brother Peter or his sister Laurie told him about his dad showing up in court to support Peter's wife in a custody dispute *961 over their daughter. He became upset and called his father; his father hung up on him. He went over to the house. He only lived eight to ten blocks from his father's house. Carol opened the door and told him his father was "pretty mad." Steven initially testified on direct examination that his father came down the stairs with a pistol in his hand pointing it at him. However, on cross examination, Steven denied making that statement in his testimony, rather, he maintained that he merely stated that his father had the gun in the palm of his hand. He testified that he pushed his father down. His father got up and swung the pistol at him. He pushed his father down and the gun dropped. He took the gun and threw it in the den and left. During the confrontation he told his father, he must be crazy. His father did not fire a shot, nor did he hit him with the gun (Steven ducked). He pushed his father twice. Carol was present when this incident occurred. Steven also testified that Mike and Bobby Hennessey were also present. Steven also testified that when he threw the gun in the den, it accidently went off while hitting the floor. When the pistol incident occurred his father was in his late 60's and Steven was 29 years old. Carol later called to make sure he was not going to call the police. Steven's wife, Joan Jurisich was not present when this incident occurred but she witnessed how upset her husband was when he returned home and she also corroborated Steven's testimony that Carol called the house afterwards and spoke with Steven.
The next time that he talked to his father was around graduation time in 1988, and his father did not attend the graduation. After that, he did not talk to his father again until December, 1989 when his son was born. He brought his son over there twice to visit. Carol was putting the garbage out and he stopped and talked to her. She saw the child and told Steven his father was sleeping. A week or so later he went over to the house again and his father was out in the yard. He drove up and told his father he just wanted to show him his grandson. His father replied that the child was not his grandson and so he left and never attempted to try to contact his father again after that.
When asked whether any two year periods passed when he did not see his father, he replied "It was pretty close." However, he maintained that the reason for the failure to see his father for this length of time was the fact that his father had chased him out of his house with a gun. He thought that was sufficient reason.
Steven felt sure Carol influenced his father, as his father was one to forget but she was the type to keep stirring things up. Carol called him and told him that Peter had threatened her son's life. He talked to Peter and he denied it. He attended his father's funeral and Carol asked him to be a pallbearer.
Steven testified that he was contesting the will because it was a lie that he failed to communicate with his father for a two year period. He made repeated attempts to contact his father and the only gap was after the incident with the pistol.
His testimony as to whether a two year period ever passed when he did not see his father was inconclusive. At one point he testified "It was pretty close".
Carol's version of the gun incident differed substantially from Steven's version. Carol testified that Steven came over to the house, walked in the door and kissed her. The testator was at the sink washing a head of lettuce. Steven went up to his father and asked what his father had been doing at the trial. His father told him that he was a grown man and did not have to explain anything to him about what he did. Steven then belted his father and his father's glasses flew off. While Carol was trying to pick up her husband's glasses and help him up Steven called his father a "son of a bitch" and told him that if he got up again he was going to hit him again. After Carol helped the testator up, Steven belted him again. Hearing the commotion, Carol's son, who was upstairs, came running downstairs. She told her son to get Steven out. Steven left and later called back and asked for Carol and tried to apologize. She told him he should apologize to his father. Her brother-in-law, Edmond Jurisich came over and they called a judge they knew and explained the situation. *962 The judge told them that what they should do was to put Steven under a peace bond. Carol denied seeing the testator pistol whipping Steven and stated that her husband did not have a gun when Steven came in. Rather, she and Al were both in the kitchen. It was only after Steven had hit his father that his father ran upstairs, came down with the gun, and ordered Steven to leave and not come back in his house or he would kill him.
The testator's brother, Edmond Jurisich testified that he went over to his brother's house after the gun incident and that they had called a judge. He also attempted to corroborate Carol's testimony that Steven called the house after the incident; but he admitted that he did not hear the telephone ring.
Irrespective of which version of the gun incident is accepted; it is the opinion of this court that this "contact" with the testator is not the type of contact envisioned by C.C. art. 1621(12). Apparently this was the first contact Steven had with his father in a while. The purpose of visiting the testator was clearly not to have any type of meaningful communication or contact. Rather, Steven testified that after learning that his father had appeared in court in support of his brother's wife in a custody dispute, he decided to confront his father. The confrontation was not the sort of peaceful, respectful communication contemplated by LaC.C. art. 1621(12). To the contrary, the motivation for the confrontation was Steven's sense of loyalty to his brother, not to his father. Steven Jurisich did not present sufficient evidence to rebut the presumption of no contact within a two year period.
Steven was the adult child who undeniably maintained a somewhat cordial relationship with his father longer than any of his siblings, at least up until the gun incident in 1986. However, the record does not support a finding that no two year period passed when he failed to communicate with the decedent. The burden of rebutting the allegation concerning the reasons for disinherison rests with the forced heir. Where the evidence does not clearly preponderate on this issue, the will of the testator must be upheld. Accordingly, the disinherison of Steven Jurisich is upheld.

Laurie Jurisich Henderson
Laurie Jurisich Henderson is the youngest of the Jurisich children. At the time of trial she was thirty-three years old. Laurie testified that she was the first of the siblings to lose total contact with her father. She left home in June, 1977 when she was eighteen years old. She also testified that she had no contact at all with her father after 1983.
Laurie testified that during her childhood, she and her father basically had a good relationship. They were "not the best of friends, but certainly were not enemies, either." Her father attended her ball games; they went to Lacombe; they spent time doing things together. They had people over to the house often. When her mother died in 1971 things did not really change that much. They still had people over and family gatherings, etc.
In 1973 her father was forced to move his business from downtown to Metairie and things were a little stressed and money tight but they were still very close. It was not until the beginning of 1977 that problems arose.
Before her father's second marriage, Laurie and her sister Linda were living at home. In early 1977 Carol was coming over to the house a lot and was calling Laurie five to six times a day. She was friendly and they knew she and her father were going to get married. In the beginning Laurie was happy and thought this was going to be great. Carol would be like her mother and help her father. None of her siblings ever expressed any hesitation before the marriage. It was not until afterwards that problems arose. Carol kept saying that she wanted Laurie to come live with her and she wanted to help straighten out Laurie's life. Laurie testified that she continuously asked Carol what needed to be straightened out.
When her father married Carol, Laurie was 18 years and one day old. Things immediately started changing for Laurie. Prior to her eighteenth birthday she never had any rules or any kind of curfew. Before her *963 father married Carol, he trusted Laurie; after the marriage, he told Laurie he did not trust her.
The last family gathering they had was the day Carol and her father married. Laurie testified that her relationship with Carol "changed from good to bad as soon as she started manipulating, lying, twisting my words, and causing me to have problems with my father." This occurred before they even got married.
Laurie testified that she was halfway through her senior year of high school and Carol thought it would be best if she went to boarding school. She mentioned it to her father and to Laurie, but her father did not accept the suggestion. He didn't think that was necessary. Her sister Donna smoked a joint (marijuana) at the wedding reception, and "it didn't go over very well." Laurie was accused right after the honeymoon. Carol commented that they were awful children. This was a day or two after the wedding. Carol never let anything drop and Laurie was bothered by this up until the last day she spoke to her father. She felt the accusation was directed at her and Donna. Donna tried to speak to her father about it but she received a beating for her efforts.
There was a family gathering for her father's birthday (in May) but after that the gatherings ceased. According to Laurie, things really started to fall apart the night of her senior prom. She and her friends booked a hotel room after the prom and stayed out all night, as it is a tradition that graduates stay out on the night of the prom. She did this for her junior prom and never had any problems. After her father married Carol, suddenly Laurie found herself grounded for the first time in her life. She had a curfew for the first time in her life and her father called her a slut. She kept trying to explain to her father that several couples were in the hotel room, but he did not listen or try to understand and talk about it. He just yelled at her.
Laurie had one more incident with her dad (two weeks later). She was out with her boyfriend Henry and they came back to the house around 11:00 p.m. with a pizza. They put the pizza in the oven and started watching the television. Carol came in and asked what they were doing and Laurie replied cooking a pizza and watching television. According to Laurie, Carol disappeared and the next thing she knew her father came home from work and started "beating the hell" out of Laurie and her boyfriend. The boyfriend was able to leave but she had two black eyes. She ended up with scratched corneas on both her eyes (she had been wearing glass contact lenses at the time) and bruises all over her body. Prior to this her father had never hit her. Her father did not say why he beat her. She kept telling her father that it was not yet 12:00 a.m. and that she did not understand what the problem was. But he would not give her an answer, he just kept hitting her. Her brother Steven woke up and came and pulled her father away and pushed him out of the room.
Carol's story of what happened that eventful night was somewhat different from Laurie's. Carol testified that on the night in question Laurie had supposedly been grounded for a week. After a week she wanted to see her boyfriend and asked if he could come over. Al said okay, but informed Laurie that the boyfriend was to be out of the house at 12:00.
That night, Carol was in her room with the door closed when the phone rang about ten times at approximately 12:15 p.m. Initially, she let it ring because Laurie was downstairs. When she finally picked it up, she discovered it was Al on the other end asking if "that boy was still there." She replied that she did not know but that she would go downstairs to see. Al said if he was still there to tell him it was after 12:00 and to please leave. Carol testified that she went down and told Laurie what her father had said. Laurie told her she knew it was her father calling and that was why she didn't answer the phone. Laurie then started using "bad words." Carol was embarrassed to hear Laurie talk like this in front of a strange boy, but told Laurie all right and went back upstairs, closed her door and went back to bed. According to Carol, the phone rang again 15 minutes later and she let it ring, but then rather than wake up Bobby, Mike or Stevie she answered. Al asked if *964 the boy was gone. She informed him that she did not know because she had come upstairs and closed the door.
Not long after the second call, she heard a commotion downstairs and went down to find Al pushing the boy out the front door and Laurie running upstairs. Steven came in and she went back to her room and did not see what happened. Carol did not see Al hit Laurie. When Al came upstairs, she asked why he left and came home and he said because Laurie was defiant.
Carol saw Laurie the next day. She testified that she did not look at Laurie's body, but that her face looked okay. However, she testified that Stevie told her that Alvin admitted the next day that he had punched Laurie.
When confronted with the fact that Laurie and Steven had testified that the phone didn't ring and queried as to whether she called Al first, she replied no. She was not interested in what was going on downstairs as the girl was of age and she was sitting down there with a pizza. The world wasn't going to come to an end. Besides, according to Carol, this incident was "just the icing on the cake."
Carol testified that there had been other incidents between Laurie and her father. One incident that she recalled occurred when Laurie was going to her graduation from Cabrini High School in May of 1977. Laurie went to the prom.
The next morning the testator came home from work. Carol got up and fixed his breakfast. When he went upstairs to go to bed, he looked into Laurie's room and asked where Laurie was. She told him she did not know as she didn't check bedrooms. He told her that Laurie's bed had not been slept in. He stayed up waiting for Laurie, and when Laurie came in wearing blue jeans, he asked where she had been. She said she was at a certain friend's house and they had a party. He told her to get the mother on the phone right then. He asked the lady whether Laurie had been present at a party at her house. The lady stated that there had been no party. The fact that Laurie had lied infuriated her father. Laurie then told her father she had been at a motel. Her father became angry and told her she was punished for a month because she had lied, not because she went to a motel.
Laurie testified that she remained in the house less than a month after the pizza incident. Her father did not speak to her or about her while she was around. She did not discuss the physical discipline with Carol. She had only one more conversation with Carol (two weeks later). Carol came to her room one night and said she wanted to tell her the truth about Laurie's mother. Laurie said she did not want to hear it and repeatedly asked her not to tell her as it was not fair to talk about her mother, who was dead. Carol allegedly told Laurie that her mother was not the kind, sweet person that they thought she was. Rather, Carol told Laurie that her mother had been unfaithful.[13] Laurie testified that she lost her temper and started screaming, yelling and cursing. This was the second time her father came home from work (something he had never done prior to the first incident). He slapped Laurie around and screamed at her about respecting his wife.[14] She tried to explain but he would not listen. She tried to explain for the next 5 years and he did not want to hear it. The next day he came in and told her that if she could not respect his wife, she could get out of his house and that she had until the end of the month to do so. He then left and told her that if she wanted to go to college, she could figure out how to pay for it on her own.
She did not talk to Carol as she knew she would change the wording and manipulate it and give an entirely different theory to her father and she had enough problems. She didn't need Carol's help. She talked to her siblings and they were very angry and upset and she believes they all tried to talk to her father, but his mind was made up. *965 After she left the family home she lived "here and there." All the other children had left home when they went to college or when they married. She had been planning to go to school away and basically have the same arrangement Steven had, i.e. she had planned to just live at home on weekends.
Laurie testified that Carol's son Michael told her that she had threatened Carol, but this was not true because Carol was "not worth the effort." Laurie also testified that her father never gave her so much as even a free cup of coffee after he put her out. Relatives helped with college tuition and when he found out, he went into a rage.
Laurie testified that she heard Carol say she did not like the house in Lacombe. Carol also mentioned they wanted to buy a house in Mississippi where the inheritance laws were different. They would not have to worry about the children trying to take the property away from Al.
Laurie testified that none of the children provoked the sale of Lacombe. It was all her father's idea. The children wanted to keep it for sentimental reasons. When he tried to sell it at first, she was the one leading the effort to stop the sale. She hired the lawyer, but later Peter took the lead.
After she received the $13,000 settlement money she still continuously tried to communicate with her dad. She tried to see him at the Morning Call. She wrote him one letter and delivered it to the Morning Call. She gave it to Jackie Grush and asked him to deliver it to her dad and he told her he did. She also saw him at the Morning Call. The settlement was in 1979 and she continued to see him up until 1983.
Liz Hunter, a former employee at the Morning Call stated that she was married to Edmond Jurisich's son Eddie. She recalled seeing Laurie trying to talk to her father the last year she worked at the Morning Call. She thought this was in either 1979 or 1980.
Every time Laurie tried to talk to her father, he asked what she really wanted. He always insinuated she wanted something from him, but she kept telling him all she wanted to do was to be able to talk to him. The last time she went to the Morning Call to tell him she was getting married, he told her to leave, that it did not concern him. He told her not to come back, and that if she did he would have her arrested. After that her father never tried to contact her. She stopped trying to contact him as she felt it was futile. She couldn't stand to be rejected anymore. Each time she went it got worse. She knew there was no chance of reconciliation as long as Carol was there to lie.
Laurie admitted that the statement in the will that she failed to contact her father for a period exceeding two years was true. However, Laurie maintained that efforts to contact her father were futile and thus just cause existed for not contacting him. She did not contact her father for over two years because he told her not to and he told her to get out of his life. He said she was not a part of his life the last time she saw him in 1983. Before her father died, she was not aware of the inheritance laws and of the need to contact her father. She did not contact her father because he told her not to. He told her to get out of his life. He said she was not a part of his life the last time she saw him in 1983. She attended her father's funeral.
There was conflicting testimony as to whether Laurie left the family home voluntarily or whether the testator "kicked her out". Steven and the other siblings all testified that Laurie was kicked out. However Carol Jurisich and Charles Emile Bruneau, Jr., the attorney who drafted the will testified that the decedent stated that Laurie was told to either respect Carol and follow the rules of the house or move within thirty days. She stayed thirty more days, and then voluntary left home.
Laurie admitted that she was told if she could not respect Carol, she had to leave. Her testimony supports a finding that she had no respect for Carol and that even after fourteen years she still was not able to speak to Carol civilly. She testified that she attended her father's funeral, and that Carol spoke to her, but she did not speak to Carol. Moreover, Laurie made it clear that she really had no respect for her father. When asked what made her think her father was of unsound mind she replied that she felt her *966 father was of unsound mind as of 1977 as "why else would he throw his 18 year old daughter out of the house?"
There is conflicting testimony as to whether the testator gave Laurie a bank book for a savings account containing $3000 plus odd dollars when she left. Carol testified that not only was Laurie given the bank book, but that she was allowed to take all the furniture in her room. It is virtually impossible for this court to determine which version of the facts is true as to the circumstances surrounding Laurie's leaving home. We are severely hampered by a "cold record" coupled with a lack of findings of fact by the trial court.
Irrespective of which version of facts is true, we find that Laurie failed to contact her father for at least a two year period. Moreover, given the unanimous testimony of all the siblings that prior to the marriage to Carol, all of them had a close relationship with their father, we are unable to say that Laurie had just cause for refusing to continue to contact a father who apparently provided her with an education from one of the noted Catholic schools in this City, a father who admittedly had attended all her baseball games as a child, a father who provided a happy childhood filled with good memories. Assuming arguendo that her father did slap her, an act which this court cannot in any way condone, there is no testimony that her father had ever hit her prior to these incidents that apparently all occurred within a two month period, nor that he ever hit her again. Rather, the hitting appeared to be isolated incidents. Her testimony that she spent the next five years trying to explain to him is vague at best as this court has absolutely no way of knowing the contents or timing of those alleged communications. More importantly, from reading all the testimony, it is not clear that any of the attempts to contact the testator occurred prior to the running of the two year period of no contact. Her absence for such a long period of time, along with the acrimonious litigation involving the partitioning of the community property owned by the testator and their mother may well explain why her father apparently was not predisposed to reestablish a relationship with her. Regardless of whether her father was being unfair in reacting this way when the children certainly had every legal right to receive their share of their mother's estate, the fact remains that the burden of establishing sufficient communication with her father was on Laurie, and she failed to meet this burden.
Laurie's problems with her father appeared to have been ongoing and regrettably ended in alienation when she chose to leave the family home at age eighteen. Laurie's account of what happened during the crucial confrontations differed substantially from Carol's. Laurie maintained that Carol told lies about her, and Carol of course maintained that it was Laurie and the other siblings who lied. When confronted with inconsistencies between her testimony and the testimony given by Laurie and Stevie concerning whether the phone rang the night of the pizza incident or whether the two children had perjured themselves, Carol replied:
Well, I guess so. I'm going to say one thing, if I can: My husband said that if one lies, the other five will swear to it.
According to Carol her husband always said the children lied and that it was a sickness, that they "lie so much they actually believe these lies ..."
It is not necessary for this court to try to attempt to determine which party was telling the entire truth. Given the lengthy amount of time that had passed since the events surrounding Laurie's departure from the family home occurred, it is possible that the parties may have remembered the events differently. Alternatively, it is possible that one or more of the parties may have intentionally misstated the facts. Yet, by her own testimony, Laurie failed to prove that the statement concerning her lack of communication with the testator was false. Had Laurie's father died in the years in close proximity to her having reached the age of majority, her lack of interest in reconciling with her father might be viewed in a different light. However, he did not. Laurie left the home in 1977 and her father died in 1990. During that entire time the record does not support a finding that Laurie made any serious attempts to reconcile with her father prior to *967 the lapse of a two year period. Consequently, the disinherison of Laurie Jurisich Henderson is upheld.
For the reasons herein stated, we find that the evidence supports a finding that Alan, Donna, Linda, Peter and Laurie failed to contact the testator for at least two years and that no just cause existed for the failure to contact the testator. The evidence does not unequivocally support a finding that Steven Jurisich failed to contact the testator for a two year period. However, the evidence is sufficient to establish that it is likely that two years elapsed with no contact and since the burden of proof is on the forced heir, we find that his disinherison must also be sustained.
In reaching these conclusions, this court is mindful of the fact that at the time that the decedent executed his will disinheriting his children, a long line of jurisprudence existed indicating a preference for protecting the rights of forced heirs. At the same time however, numerous cases recognized the inequity of not allowing a testator to disinherit children who behaved in a disrespectful way toward their parent. This court is of the opinion that the testator was certainly not blameless in this sad state of affairs which resulted in total alienation from his children for a period of over ten years. Yet a review of the testimony given by four of the children at the trial of this case indicates to this court that the primary responsibility for the alienation that existed between these adult children and the testator rests primarily with the adult children.
The testator died alienated from his children and it is only fitting that the children remain alienated from his estate.
For the above given reasons, this court finds that the trial court clearly erred when it stated that Act 788 of 1989 was constitutional. However, this court specifically finds that the record supports a finding that the decedent effectively disinherited all six of his adult children for failing to contact him for a two year period. None of the children proved that "just cause" existed for failing to contact the decedent for a period of two years. Consequently, the judgment of the trial court upholding the validity of the decedent's last will and testament is affirmed.
All costs of this appeal are assessed to the appellants.
AFFIRMED.
NOTES
[1] Article 1493 of the Civil Code removed competent descendants over the age of twenty-two from the category of forced heirs.
[2] Steven testified that personally, he did not care that much about the property being sold.
[3] The testimony concerning the incidents related to Laurie and Donna are discussed more fully in the sections of this opinion recounting their testimony and the testimony of other witnesses.
[4] The incidents leading to Peter's termination from the family business are discussed in detail in the section of this opinion recounting Peter's testimony.
[5] This statement conflicts with the testimony given by Carol as Carol testified that the neighbor called and asked to speak to Al and told Al what had happened. Steven Jurisich also testified that he believed his father found out about the incident from Mrs. Miller, a neighbor across the alley who was at the wedding reception.
[6] Each of the siblings expressed outrage over this incident. Although Steven was the only child in the house when this incident allegedly occurred, each child cited this incident as a primary example of the drastic change which occurred in their father after his marriage to Carol.
[7] Although Carol's testimony conflicted with the story given by the siblings of what occurred, it is not necessary for this court to attempt to decide which version is true. The only point of this discussion is to show what the various parties to this litigation believe happened at the time and how that belief influenced their thinking concerning Carol's influence on their relationship with their dad.
[8] Again, Donna was not present in the house and did not hear this conversation, but relied upon what her eighteen year old sister, Laurie told her.
[9] There was no testimony from Laurie as to the date she got married nor was there any testimony to indicate she invited her father to attend.
[10] Forest Villarubia was Linda's uncle, the brother of her deceased mother.
[11] Audrey Villarubia was Forest's wife and was also Linda's godmother.
[12] Significantly Donna's boyfriend, Tommy Mason testified that Donna had family pictures all over her house, however, it is unclear whether these were the same pictures Peter was talking about.
[13] Carol denied telling Laurie her Mother was unfaithful. Rather, Carol testified she knew the mother when she was eighteen and she was a nice lady.
[14] Carol testified that there never was a time that Alvin ever laid a hand on Laurie that she knew about, not while she was there.